MDM GROUP ASSOCIATES, INC.,
Plaintiff–Appellee and Cross–
Appellant,

v.

CX REINSURANCE COMPANY LTD.,
U.K. and Certain Underwriters at
Lloyd's, London, Defendants–Appellants
and Cross–Appellees.

No. 04CA2614.

Colorado Court of Appeals,
Div. III.

Feb. 22, 2007.

Certiorari Dismissed June 25, 2007.

Holland & Hart LLP, Marcy G. Glenn, Christina F. Gomez, Denver, Colorado; Lind, Lawrence & Ottenhoff, LLP, Richard T. Li Puma, Windsor, Colorado, for Plaintiff–Appellee and Cross–Appellant.

Hall & Evans, L.L.C., Alan Epstein, Edward H. Widmann, Bruce A. Menk, Denver, Colorado; Lettunich & Vanderbloemen, L.L.C., John A. Vanderbloemen, Steamboat Springs, Colorado; Horvitz & Levy LLP, David M. Axelrad, Mitchell C. Tilner, Encino, California, for Defendants–Appellants and Cross–Appellees.

Opinion by Judge CASEBOLT.

This action involves claims for breach of fiduciary duty and intentional interference with prospective business relations asserted by an insurance broker against several insurance companies. Defendants, CX Reinsurance Company Ltd., U.K., and Certain Underwriters at Lloyd's, London (collectively, CX), appeal the judgment entered upon a jury verdict awarding $6,750,783 to plaintiff, MDM Group Associates, Inc. (MDM). CX also appeals the award of prejudgment interest. MDM cross-appeals the trial court's orders dismissing its punitive damages claim and excluding evidence of CX's conduct related to the punitive damages claim. We affirm in part, reverse in part, and remand.

MDM is an insurance broker. Joseph McNasby, its president, developed an insurance program for insuring ski resorts against the risk that the number of "paid skier days" during a ski season would fall below a specified minimum. CX and others agreed to write insurance policies covering the risk for a year, starting with the 1997–1998 ski season, and issued such policies to a number of ski resorts in exchange for premium payments.

During that initial year, the policies generated premiums of about $550,000. MDM received a commission of 12.5% of the premiums from AON, an intermediate broker who was the holder of a lineslip, the document committing various underwriters to write the

coverage and setting the terms of payment. No claims were submitted under the policies during the first season.

The ski resorts and the underwriters renewed the policies for a second year, and the program had similar results during the 1998–1999 ski season, generating premiums of about $476,000, from which MDM received a commission. Once again, there were no claims submitted under the policies.

Before the 1999–2000 ski season, several underwriters declined to renew their involvement. However, CX issued policies for that year, which, because more ski resorts purchased the coverage, generated total premiums of approximately $3 million. MDM received commissions totaling approximately $378,000.

The 1999–2000 ski season was not a good one for the insured resorts. There was little snowfall in the United States until well after the Christmas and New Year's ski holidays, and vacation travel was reduced because of concerns related to the millennium change. All insured resorts, including Vail, Mammoth, and Booth Creek, submitted claims. CX negotiated, mediated, and litigated the claims, ultimately paying in excess of $23 million to completely settle them. As was its unqualified right, CX declined to renew the insurance policies after their one-year term expired in May 2000.

MDM initiated this action against CX asserting liability for intentional interference with prospective business relations, contending that CX had handled the ski resort claims improperly and in bad faith, thereby causing the resorts not to renew their policies and causing MDM to lose renewal commissions. MDM also asserted that potential new clients, including other North American and Japanese ski resorts, hotels, cruise lines, fairs, and expositions, did not purchase similar policies that MDM proposed to sell to protect against loss of revenue, and therefore MDM lost commissions that would have resulted from those prospective policies.

In addition, MDM asserted a breach of fiduciary duty claim, contending that CX, as the principal in an agency relationship with MDM, owed it a fiduciary duty, and breached

its duty by improperly handling the ski resorts' claims.

The trial court denied CX's various motions for dismissal and directed verdict. The jury returned a verdict in favor of MDM for $6,750,783 in damages, and the trial court later awarded more than $1 million in prejudgment interest. This appeal followed.

### I. Intentional Interference with Prospective Business Relations

CX contends that the judgment on the intentional interference with prospective business relations claim must be reversed for a number of reasons. It asserts that an insurer is answerable solely to its insureds for deficiencies in claims handling, not to any intermediate broker; that its conduct toward the resorts was not improper because it was entitled to investigate, challenge, negotiate, mediate, or litigate the claims, and the jury did not find that it acted in bad faith; that MDM would not have been a party to any prospective contracts and would not have received an economic benefit from the contracting parties; that MDM could not sell any lost paid skier day policies after the 1999–2000 ski season because CX opted not to renew and no other underwriter replaced it; and that the claim fails for lack of any causative relationship between the conduct of CX and the asserted damages. We agree that MDM would not have been a party to any prospective contracts, and therefore the judgment cannot stand.

CX moved for a directed verdict and judgment notwithstanding the verdict (JNOV) on the intentional interference claim. A motion for a directed verdict or JNOV should not be granted unless the evidence compels the conclusion that reasonable jurors could not disagree and that no evidence or inference has been received at trial upon which a verdict against the moving party could be sustained. The trial court must view the evidence in the light most favorable to the nonmoving party. We review a motion for directed verdict de novo. *Fair v. Red Lion Inn*, 943 P.2d 431 (Colo.1997); *Brossia v. Rick Constr., L.T.D. Liab. Co.*, 81 P.3d 1126 (Colo.App.2003). If there is no evidence to support an element of a claim, a

directed verdict is appropriate. *Denver Dry Goods Co. v. Pender,* 128 Colo. 281, 262 P.2d 257 (1953); *Anson v. Trujillo,* 56 P.3d 114 (Colo.App.2002).

■ Colorado recognizes the tort of intentional interference with prospective business relations. *Amoco Oil Co. v. Ervin,* 908 P.2d 493 (Colo.1995); *Dolton v. Capitol Fed. Sav. & Loan Ass'n,* 642 P.2d 21 (Colo.App.1981). As set forth in the Restatement (Second) of Torts § 766B (1979):

> One who intentionally and improperly interferes with another's prospective contractual relation ... is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

■ While the existence of an underlying contract is not required for this tort, there must be a showing of improper and intentional interference by the defendant that prevents the formation of a contract between the plaintiff and a third party. *Omedelena v. Denver Options, Inc.,* 60 P.3d 717 (Colo.App.2002); *Wasalco, Inc. v. El Paso County,* 689 P.2d 730 (Colo.App.1984). Interference with "another's prospective contractual relation" is tortious only if there is a reasonable likelihood or reasonable probability that a contract would have resulted. *Klein v. Grynberg,* 44 F.3d 1497 (10th Cir. 1995); *Plaza Esteban v. La Casa Nino, Inc.,* 738 P.2d 410 (Colo.App.1987) (lack of a firm offer of a contract defeated tortious interference claim), *rev'd on other grounds,* 762 P.2d 669 (Colo.1988).

■ However, a defendant cannot be liable for interference with its own contract: It is impossible for one party to a contract to maintain against the other party to the contract a claim for tortious interference with the parties' own contract. Neither party is a stranger to the contract. Each party has agreed to be bound by the terms of the contract itself, and may not thereafter use a tort action to punish the other party for actions that are within its rights under the contract.

*Shrewsbery v. Nat'l Grange Mut. Ins. Co.,* 183 W.Va. 322, 324, 395 S.E.2d 745, 747 (1990). To the extent, therefore, that MDM is asserting a claim against CX for tortiously interfering with a contract between itself and CX, such a claim may not be maintained. *See CrossTalk Prods., Inc. v. Jacobson,* 65 Cal.App.4th 631, 76 Cal.Rptr.2d 615 (1998); *Travelers Indem. Co. v. Merling,* 326 Md. 329, 605 A.2d 83 (1992); *K & K Mgmt., Inc. v. Lee,* 316 Md. 137, 557 A.2d 965 (1989); *Shrewsbery v. Nat'l Grange Mut. Ins. Co., supra.*

It logically follows, as well, that MDM cannot maintain an action against CX for tortious interference with *any* contract to which CX is a party. *See Shrewsbery v. Nat'l Grange Mut. Ins. Co., supra* (independent insurance agent could not maintain tortious interference action against insurer in which agent asserted that insurer sought to procure a breach of contract between agent and his insurance customers because insurer was a principal party to the insurance contracts and no one can be liable for tortious interference with his own contract); *see also Cutter v. Lincoln Nat'l Life Ins. Co.,* 794 F.2d 352 (8th Cir.1986)(no tortious interference claim could be asserted as a matter of law by former life insurance agent against insurer because there was no business relationship—contractual or otherwise—that agent had with the insureds which was independent of agent's role as agent for insurer); *Furr Mktg., Inc. v. Orval Kent Food Co.,* 682 F.Supp. 884 (S.D.Miss.1988) (sales of defendant's product were transactions between the customer and defendant; any existing or prospective contractual relationships interfered with would be those of defendant, not plaintiff; hence, plaintiff could not prove the existence or likelihood of a contract between itself and a third party).

Accordingly, MDM cannot assert tortious interference as to the insurance contracts between CX and the insured ski resorts. *Cf. Sterling Colo. Agency, Inc. v. Sterling Ins. Co.,* 266 F.2d 472 (10th Cir.1959)(insurance agent could not recover for lost commissions

occasioned by bad faith conduct of insurance company; absent specific contract provisions, agent has no voice in the settlement of policy claims). Nor can MDM assert a claim against CX for prospective contractual relations if CX were expected to be a party to that contract. *See Furr Mktg., Inc. v. Orval Kent Food Co., supra.*

 MDM asserts, however, that the relationship involved here is the prospective or future contractual relationship between it and ski resorts and prospective insureds such as the North American and Japanese ski resorts, hotels, cruise lines, fairs, and expositions. MDM's assertion, however, misconstrues the role of an insurance agent. As the West Virginia Supreme Court noted:

> [An insurance agent] is not a party to a contract with the insured; rather, he helps the company procure and service the [insurance] company's contract with the insured. An agent, then, is but an incidental beneficiary to the contract between insured and insurance company. The agent's right to commissions—his economic interest in the insurance contracts—is of no concern to the insured, and solely a matter of contract between the agent and his principal, the insurance company.

*Shrewsbery v. Nat'l Grange Mut. Ins. Co., supra,* 183 W.Va. at 325, 395 S.E.2d at 748.

Here, MDM could have no prospective contract with these potential insureds because it would be acting as an agent for the underwriter in procuring insurance. Indeed, the evidence here showed that MDM received commissions on these particular policies from AON, an intermediate broker, who in turn received commissions from CX. No insured entity paid commissions to MDM, and the evidence did not show that future potential insureds would do so either. And MDM offered no evidence that it had or could have any "prospective contractual relations" with ski resorts or others by which it would receive any compensation other than policy commissions, which it would receive from the underwriter. *See Ward v. Life Investors Ins. Co.,* 383 F.Supp.2d 882 (S.D.Miss.2005) (claim for interference with prospective business advantage requires a plaintiff to prove the existence of a prospective relationship marked by a reasonable likelihood that relationship will come into existence; former insurance agents could not prove such because their commission expectancies were derivative of a contract between insurance company and insured).

It does not matter that potential insureds would pay for their potential policies by tendering funds to MDM. Under such circumstances, even though MDM might be authorized to receive payments and retain its commission, the contractual relationship remains between the underwriter and the insured, as to which MDM would be only an incidental beneficiary. *See Shrewsbery v. Nat'l Grange Mut. Ins. Co., supra.*

 Moreover, to the extent MDM asserts that CX interfered with its potential future contracts with other *underwriters*, the undisputed evidence reveals that it was able to solicit and obtain a replacement underwriter, who offered to insure the ski resorts under a new and different policy. That the terms of the new policy were significantly less favorable to the ski areas, which may have persuaded them not to purchase coverage after CX declined to renew, does not prove any interference by CX with MDM's prospective relationship with a new underwriter.

MDM's reliance upon *Amoco Oil Co. v. Ervin, supra,* and Restatement (Second) of Torts § 766B cmt. c for a contrary result is misplaced. In *Amoco,* the court noted that there need not be a binding formal contract for the intentional interference with prospective business relation tort claim to be viable. It quoted the Restatement section and analyzed the economic relationship between a dealer and customers who would purchase the dealer's products:

> Comment c of section 766B notes: ["]The expression, prospective contractual relation, is not used in this Section in a strict, technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation.["]

When a customer utilizes a dealer's products or services, the relation is transactional and is not "reduced to a formal, binding contract." Rather, by purchasing products or services from a particular service station, a customer confers an economic benefit upon the dealer, but does not establish a multi-transactional, continuing contractual relationship. The benefits that flow to the dealer constitute "quasi-contractual or other restitutionary rights." The relationship between potential customer and dealer complies with the definition of prospective contractual relation used in section 766B.

*Amoco, supra,* 908 P.2d at 500 (citation omitted).

In *Amoco,* a customer's purchase of a dealer's product or service was directly from that dealer, who would receive compensation from the customer, whereas here, the purchase of an insurance product would be only from the underwriter, and the agent, MDM, would receive compensation from the underwriter. Under *Amoco,* the party asserting an intentional interference claim must be a party to the prospective quasi-contract, and here, MDM would not be a party to any insurance contract. Thus, although MDM would be paid a commission on any sale of an insurance policy, that right would devolve from the obligation of the insurer to compensate its agent. Hence, MDM would have no prospective quasi-contractual relations with insureds or potential insureds that would allow recovery against CX here.

Moreover, while it is true, as MDM asserts, that it had "business relationships" with prospective insureds and other underwriters, contrary to its assertion, MDM did not market "its own" insurance policies. Instead, it marketed CX's policies, and, for future or prospective insureds, it would be marketing policies to be issued by replacement underwriters.

Accordingly, neither *Amoco* nor the Restatement requires a different result.

Because MDM did not and could not present evidence of any prospective contractual relations with any ski resorts, hotels, cruise lines, fairs, and expositions, MDM's tortious interference claim fails, and CX was therefore entitled to a directed verdict on this claim.

In light of this determination, we need not address CX's additional reasons for reversal.

## II. Breach of Fiduciary Duty

CX contends that MDM's breach of fiduciary duty claim must fail because a principal cannot owe a fiduciary duty to an agent as a matter of law. Alternatively, CX contends that it did not owe MDM any fiduciary duty here. We agree that CX did not owe MDM any fiduciary duty under these circumstances.

Initially, MDM contends that CX did not preserve this issue for appeal. However, CX continuously asserted and argued that it did not owe MDM any duty at all under these circumstances. In addition, it objected to the jury instruction concerning fiduciary duty. We conclude that this argument and objection were sufficient to preserve the issue.

The existence of a fiduciary relationship is a prerequisite to the finding of a breach of a fiduciary duty. *Paine, Webber, Jackson & Curtis, Inc. v. Adams,* 718 P.2d 508 (Colo.1986); *Command Commc'ns, Inc. v. Fritz Cos.,* 36 P.3d 182 (Colo.App.2001).

A fiduciary duty arises among parties through a relationship of trust, confidence, and reliance. Certain types of relationships give rise to general fiduciary duties as a matter of law, such as attorney-client, principal-agent, and trustee-beneficiary. *Bailey v. Allstate Ins. Co.,* 844 P.2d 1336 (Colo.App.1992). However, fiduciary duties are owed by only one of the parties in these relationships. "The very nature of these relationships encompasses an extensive line of duties that are performed for the total benefit of *only one of the parties* to the relationship." *Bailey v. Allstate Ins. Co., supra,* 844 P.2d at 1339 (emphasis supplied); *see Furr Mktg., Inc. v. Orval Kent Food Co., supra* (principal does not owe fiduciary duty to broker). *But see Silverberg v. Colantuno,* 991 P.2d 280 (Colo.App.1998)(partners owe each other fiduciary duties).

"[A] fiduciary duty arises when one party has a high degree of control over the property or subject matter of another, or when the benefiting party places a high level of trust and confidence in the fiduciary to look out for the beneficiary's best interest." *Bailey v. Allstate Ins. Co., supra*, 844 P.2d at 1339.

In the principal-agent context, it is the *agent* who owes a fiduciary duty to the principal as a matter of law. "An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship." Restatement (Third) of Agency § 8.01 (2006).

A principal does owe *some* duties to an agent. *See* Restatement (Third) of Agency, *supra*, §§ 8.13–8.15. However, the "obligations that a principal owes an agent, specified in §§ 8.13–8.15, *are not fiduciary.*" Restatement (Third) of Agency, *supra*, § 1.01 cmt. e (emphasis supplied).

The scope and nature of a fiduciary's duty are determined by the court as a matter of law, while a fact finder determines whether there has been a breach of that duty. *Command Commc'ns, Inc. v. Fritz Cos., supra.*

Here, the jury was instructed, over CX's objection, as follows:

> A fiduciary relationship exists whenever one person is entrusted to act for the benefit of or in the interest of another and has the legal authority to do so. If you find that the underwriters were acting as a principal of MDM, and MDM was acting as agent with respect to MDM's insurance program, then you are instructed that the underwriters were acting as fiduciaries for MDM in its insurance program.

Thus, the jury was wrongly instructed that there was a fiduciary duty as a matter of law if it found that an agency relationship existed. As a matter of law, a principal is not a fiduciary of an agent. The principal is not "entrusted to act for the benefit of or in the interest of another." It is the principal who entrusts business to the agent to act for the principal's benefit. Any

duties owed by a principal to an agent are not fiduciary. *See Furr Mktg., Inc. v. Orval Kent Food Co., supra;* Restatement (Third) of Agency, *supra*, § 1.01 cmt. e.

Further, even if a principal could owe an agent a fiduciary duty under some circumstances, no such circumstances were demonstrated here. MDM did not show that it relaxed its care or vigilance because of its relationship with CX. MDM did not entrust anything to CX. MDM was an independent insurance broker looking out for its own interests. And as previously noted, MDM was not marketing "its own" insurance policies, even though the concept of the "lost paid skier days" coverage originated with MDM.

Accordingly, the judgment in favor of MDM on this claim cannot stand.

### III. Prejudgment Interest

CX also appeals the award of prejudgment interest. Given our disposition above, the award of prejudgment interest likewise cannot stand.

### IV. Punitive Damages

As to MDM's cross-appeal of the trial court's orders dismissing its punitive damages claim and excluding evidence of CX's conduct related to that claim, because MDM's claims fail as a matter of law, it follows that the court did not err in dismissing the punitive damages claim or excluding the evidence relative to that claim.

The judgment is affirmed as to the dismissal of MDM's punitive damages claim. The judgment is reversed in all other respects, and the case is remanded with directions to enter judgment for CX.

Judge GRAHAM and Judge KAPELKE * concur.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and