**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 11, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SANFORD LEE HERTZ,

      Plaintiff – Counterclaim-Defendant
– Appellee – Cross-Appellant,

v.

THE LUZENAC GROUP, a French
corporation,

      Defendant,

and

LUZENAC AMERICA, INC., a Colorado
corporation,

      Defendant – Counterclaimant
      – Appellant – Cross-Appellee,

v.

LANE LIGHTHART, an individual,

      Third-Party Defendant –
      Counterclaimant – Cross-
      Appellant.

Nos. 06-1324, 06-1358

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 04-cv-1961-LTB-CBS)**

---

Andrew M. Low (Janet A. Savage, Richard P. Holme, and Elizabeth H. Titus with him on the briefs) of Davis Graham & Stubbs LLP, Denver, Colorado, for Defendant – Counterclaimant – Appellant – Cross-Appellee.

Theresa L. Corrada of Issacson Rosenbaum P.C., Denver, Colorado (Byeongsook Seo of Isaacson Rosenbaum P.C., Denver, Colorado, and John A. Culver of Benezra & Culver, L.L.C., Lakewood, Colorado, with her on the briefs) for Plaintiff – Counterclaim-Defendant – Appellee – Cross-Appellant.

Before **KELLY**, **HOLLOWAY**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

This appeal arises from a series of claims and counterclaims between Luzenac America, Inc. ("Luzenac") and two of its former employees, Sanford Lee Hertz and Lane Lighthart. In response to Mr. Hertz's complaint, Luzenac alleged that Mr. Hertz and Mr. Lighthart misappropriated the company's trade secrets related to the production and marketing of vinyl silane-coated talc. Luzenac also brought related claims for breach of contract and conspiracy. Mr. Hertz, in turn, filed claims against Luzenac for tortious interference with contract and with prospective business advantage; he also sought to amend his complaint to add a claim for abuse of process, but the district court denied this request. The district court found that the information that Mr. Hertz and Mr. Lighthart allegedly misappropriated was not a trade secret. It therefore granted Mr. Hertz summary judgment on that claim as well as the breach of contract and conspiracy claims. Additionally, the district court dismissed Mr. Hertz's claims for tortious interference.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in

-2-

part. We find that the question of whether Luzenac's manufacturing process is a trade secret is a question of fact that cannot be resolved on the current record. Similarly, we find that Luzenac has raised genuine issues of material fact with respect to the secrecy of its customer information. Accordingly, we **REVERSE** and **REMAND** for further proceedings on Luzenac's claims. We agree with the district court that Mr. Hertz has failed to present adequate claims of tortious interference with contract and prospective business advantage. Accordingly, we **AFFIRM** the district court's dismissal of these claims. We also **AFFIRM** the district court's denial of Mr. Hertz's motion to amend his complaint.

## BACKGROUND

Luzenac is a leading producer and seller of talc. Talc is a soft mineral in the magnesium silicate family and is used as an additive in many products, including rubber, paper, and ceramics. From 1994 until about 2002, Luzenac sold various formulations of vinyl silane-treated talc, which is used as an additive in rubbers, paints, and coatings. Beginning in 1995, that product was known as Mistron 604AV or simply 604AV. Since 2002, 604AV has been produced by one of Luzenac's distributors, Van Horn, Metz & Co., Inc. ("VHM"), under license from Luzenac, and Luzenac has sold the raw talc used in the product to VHM.

In August 1994, Luzenac hired Mr. Hertz to direct technical aspects of developing and marketing the product that later became 604AV. Luzenac employed Mr. Lighthart to market and sell 604AV to companies within the coatings industry. Mr. Hertz was fired in

January 1998, but he successfully sued Luzenac under Title VII for discharging him in retaliation for his objections to Luzenac's religious discrimination. *See Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014 (10th Cir. 2004). Mr. Lighthart testified on Mr. Hertz's behalf in the Title VII case and left Luzenac in June 2001.

A few years after Luzenac fired Mr. Hertz, Mr. Hertz obtained other work in the industry. IMI Fabi, LLC contracted with Mr. Hertz's consulting company to develop and market a vinyl silane-treated talc called "Genera." Mr. Hertz contracted with Mr. Lighthart to help market Genera and asked Mr. Lighthart to provide a list of prospective customers. When Luzenac learned of Mr. Hertz's contract with IMI Fabi, it sent Mr. Hertz a cease-and-desist letter through his counsel. Upon hearing of Luzenac's concerns, IMI Fabi reduced its efforts to market Genera. Three days later, Mr. Hertz commenced litigation against Luzenac in Colorado state court seeking declaratory and injunctive relief. In the Hertz state court action, Luzenac alleged counterclaims of interference with contract and with prospective business advantage, misappropriation of trade secrets, conversion, civil theft, and breach of contract. Mr. Hertz in turn amended his complaint to include claims of unlawful retaliation under Title VII, defamation, tortious interference with contract, and tortious interference with prospective business advantage.

Luzenac then removed the case to federal district court. Luzenac also joined Mr. Lighthart as a counterclaim defendant and added counterclaims for unjust enrichment and conspiracy. The district court denied Mr. Hertz's motion to amend his complaint to add an abuse of process claim. The district court granted summary judgment in favor of Mr.

-4-

Hertz and Mr. Lighthart on most of Luzenac's claims. Relevant to this appeal, it ruled against Luzenac on its claims of misappropriation of trade secrets, misappropriation of customer information, conspiracy, and breach of contract. It ruled in favor of Luzenac on Mr. Hertz's claims for tortious interference with prospective business advantage and tortious interference with contract.[1]

**DISCUSSION**

Luzenac appeals from the dismissal of its claims for misappropriation of trade secrets, breach of contract, and conspiracy. Mr. Hertz appeals from the dismissal of his claims for tortious interference with contract and tortious interference with prospective business advantage. Mr. Hertz additionally appeals from the denial of his motion to amend his complaint to include a claim for abuse of process.

We review the dismissal of these claims on a motion for summary judgment de novo. *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003). "[W]e also review *de novo* the District Court's interpretation of the substantive state law." *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In our review, we examine the

---

[1] Luzenac settled its claims with Mr. Lighthart during the course of this appeal. Consequently, we need not address Luzenac's request to vacate the district court's judgment entering costs for Mr. Lighthart.

evidence and draw reasonable inferences therefrom in the light most favorable to the non-moving party." *Harvey Barnett*, 338 F.3d at 1129. "Although the movant must show the absence of a genuine issue of material fact, he or she need not negate the nonmovant's claim." *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). Once the movant carries this burden, the nonmoving party must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996). An issue of material fact is genuine if the nonmovant presents facts that would allow a reasonable jury to find in favor of the nonmovant. *Id.*

## A. Is the Production Process of 604AV a Trade Secret?

Luzenac accuses Mr. Hertz of misappropriating its trade secret in the production process of 604AV. Luzenac asserts that Mr. Hertz disclosed to IMI Fabi "Luzenac's entire formula and process for producing 604AV," in violation of the Colorado Uniform Trade Secrets Act ("UTSA"). Luzenac Br. at 18. The only question decided by the district court, and the only one we consider on appeal, is whether the production process qualifies as a trade secret. The UTSA defines "trade secret" as "any scientific or technical information, design, process, procedure, formula, [or] improvement . . . which is secret and of value."[2] Colo. Rev. Stat. Ann. § 7-74-102(4). The essential test in Colorado for determining whether something is capable of protection as a trade secret was

---

[2] The parties do not dispute that Colorado law governs the state law claims at issue here.

established in *Colorado Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. Ct. App. 1990), and was utilized by this court in *Harvey Barnett*. *See Harvey Barnett*, 338 F.3d at 1129. Factors considered in determining whether a trade secret exists include:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Id.* (citing *Colo. Supply*, 797 P.2d at 1306).

The district court applied the *Colorado Supply* test in assessing Luzenac's trade secret claim. It acknowledged that the last three factors could weigh in Luzenac's favor. Specifically relevant to the fourth factor—"the savings effected and the value to the holder in having the information as against competitors"—the district court noted, "[A] reasonable jury might find that, despite the plurality of comparable products competitive to Mistron 604AV, Luzenac's position was unique as a result of the information and expertise it developed." Aplt. App. Vol. IX, at 3002-03. The district court also determined:

> The fifth and sixth *Colorado Supply* factors arguably weigh in Luzenac's favor. Luzenac expended considerable effort and time to develop its Mistron line . . . . A reasonable jury might determine that Mr. Hertz and IMI Fabi saved time and expense in developing Genera by virtue of the expertise and information Mr. Hertz obtained and discovered during his time at Luzenac.

-7-

*Id.* at 3002. The district court granted Mr. Hertz summary judgment on this claim, however, on the grounds that "secrecy is the *sine qua non* of the claim and there can be no genuine dispute that the process for manufacturing 604AV was not a secret." *Id.* at 3003.

We agree with the district court that "[i]ndispensable to an effective allegation of a trade secret is proof that the matter is, more or less, secret." 1 Roger M. Milgrim & Eric E. Benson, *Milgrim on Trade Secrets* § 1.03, at 1-260 (2009). The question of secrecy relates to the first three *Colorado Supply* factors. However, in evaluating the secrecy of the production process, the district court made three mistakes. First, it did not consider the manufacturing process in the aggregate. Second, it failed to view the evidence in the light most favorable to Luzenac, the party opposing summary judgment. Third, in considering whether Luzenac adequately protected the secrecy of 604AV, the district court focused on the evidence of the steps that Luzenac did *not* take rather than the reasonableness of the measures it did take.[3]

**1. The Production Process as a Whole**

---

[3] We are concerned that the district court took steps—in apparent confidence in the correctness of its decision—that could cause potential litigants to lose some degree of faith in the courts as an appropriate forum for resolving trade secret or like business disputes. Luzenac filed a majority of its documents under seal and requested that the district court order also be filed under seal. The district court denied this request. According to Luzenac, the district court's order contains sufficient information for someone to replicate the production process of 604AV. If true, the district court's actions could have the regrettable effect of discouraging parties from resolving similar disputes through court litigation.

When determining whether a manufacturing process is secret, we must be careful to apply the correct framework to our analysis. Luzenac claims that its trade secret comprises nine distinct elements. The district court provides a detailed discussion of how information is publicly available about individual elements of the production process of 604AV. Luzenac concedes that some of these elements may have been in the public domain, but it argues that the district court should have considered the production process as a whole, not each component separately. We agree with Luzenac.

"[A] trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Harvey Barnett*, 338 F.3d at 1129 (alteration in original) (internal quotation marks omitted). Under Colorado law, "information can be a trade secret notwithstanding the fact that some of its components are well-known." *Id.* (citing *Rivendell Forest Prods., Ltd. v. Ga.-Pac. Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994)). "*Rivendell*'s requirement of analysis in the aggregate is more than a formality. It is a substantive component of trade-secret analysis integral to a court's ultimate conclusion regarding the existence of material facts for trial." *Id.* at 1130.

In concluding that the production process of 604AV was in the public domain, the district court summarized its findings with respect to each of the elements of the process. After reviewing the evidence with respect to each of the nine elements, it determined that one of the elements was not part of the process at all, four were obtained from the public

domain, two were disclosed publicly, and two were both obtained from and disclosed to individuals outside of Luzenac. The district court concluded this summary with the statement: "Nor does the process as a whole constitute a trade secret. Each and all of the elements of the process for manufacturing 604AV are known outside Luzenac." Aplt. App. Vol. IX, at 3003. Responding to Luzenac's contention that the process as a whole could not be found in one discrete, public repository, the district court stated that this assertion was "both true and irrelevant." Aplt. App. Vol. X, at 3270.

While purporting to acknowledge the requirement to consider the elements in combination, the district court did *not* engage in any substantive analysis of the production process as a whole. "[The] presence of all of the elements of an idea in technical literature [does not] suffice, per se, to destroy trade secret status, since the secret might be in a combination of otherwise well-known principles." 1 Milgrim & Benson, *supra*, § 1.03, at 1-281. In failing to follow the holding in *Rivendell*—i.e., "a trade secret can exist in a combination of characteristics, each of which, considered separately, is in the public domain, but, taken together, may yield a competitive advantage that results in a protectable trade secret"—the district court applied an inappropriate standard. *See Harvey Barnett*, 338 F.3d at 1130; *see also Rivendell*, 28 F.3d at 1046 ("We hold that the doctrine has been established that a trade secret can include a system where the elements are in the public domain, but there has been accomplished an effective, successful and valuable integration of the public domain elements and the trade secret gave the claimant a competitive advantage which is protected from misappropriation.").

-10-

## 2. The Evidence Relating to the Elements of Luzenac's Trade Secret

We next review the district court's finding that each of the elements of the manufacturing process of 604AV has been publicly disclosed. While the finder of fact is required to consider the claimed trade secret as a whole, it may, in addition, consider whether the individual components are publicly known. A finding that some of the elements are secret may support a conclusion that the entire process is protected. Based on our review of the record, we conclude that genuine issues of material fact exist with respect to several of the elements that compose the manufacturing process. The district court gave undue weight to some of Mr. Hertz's evidence and failed to view all of the evidence in the light most favorable to Luzenac.

For example, the parties dispute whether the amount of vinyl silane in 604AV is public knowledge. The publicly available Materials Safety Data Sheet for 604AV lists the organosilane surface coating as constituting less than 1% by weight of the product. Luzenac argues, however, that there is a significant difference between knowing that it is less than 1% and knowing the exact amount. Mr. Hertz contends that the appropriate amount of silane was well known in the industry. However, Mr. Hertz's own evidence and arguments suggest that relatively minute differences in silane content have business significance in the industry and, more specifically, may be a significant variable in customers' talc preferences. Thus, Mr. Hertz's own presentation suggests that the precise amount of silane in 604AV within the 0 to 1% range had commercial value and the public would not necessarily have been able to discern that amount by simply knowing the

-11-

range. For example, one of Mr. Hertz's sources states that "one percent silane, based on filler weight, is *a good starting point*," but notes that ultimately "the optimal . . . level must be determined empirically since it depends on such factors as the surface area of the filler particle and the effects desired in the resulting composite." Aplt. App. Vol. IV, at 1088 (emphasis added). And, significantly, in his arguments here, Mr. Hertz appears to acknowledge that small differences in silane content—even within the range at issue (that is, the range from 0 to 1%)—are employed in the industry and are a significant variable in customers' assessment of a talc's value. While arguing that Genera is different from 604AV, he notes that "IMI now sells four Genera products with varying silane amounts, *ranging from .5% to .9%*, to suit the needs of various customers." Hertz Br. at 9 (emphasis added).

To be sure, Mr. Hertz has produced a letter from Luzenac to one of its customers in which it lists the amount of vinyl silane in 604AV. Aplt. App. Vol. VIII, at 2916. But without knowing more about the circumstances surrounding the letter and the relationship between Luzenac and the customer, we cannot conclude that this one letter proves, as a matter of law, that the precise amount of vinyl silane was public knowledge. Viewing all of the evidence as a whole, there is significant support for Luzenac's position that it has kept the amount of vinyl silane a secret. The ultimate weighing of that evidence will have to be done by a jury.

A second element of the claimed trade secret is the type of silane used. The record indicates that Luzenac had disclosed the fact that the coating is a vinyl silane. The type of

-12-

vinyl silane, however, does not appear to have been disclosed. Mr. Hertz maintains that one could determine the type of vinyl silane through logical deduction. Luzenac vehemently disputes, however, whether such a deduction is as straightforward as Mr. Hertz suggests. Our review of the record does not reveal an answer. For example, Mr. Hertz claims that "[t]here are only two types of commercially available vinyl silane" and that one of them could be eliminated from consideration because it may produce toxic byproducts. Hertz Br. at 8. However, Luzenac's evidence and arguments are to the contrary, indicating that there were in fact three such silanes. *See* Luzenac Reply Br. at 4 n.1 (stating that Hertz's two-vinyl-silane contention is "untrue" and noting the identification of three such silanes); Aplt. App. Vol. V, at 1710-11 (discussing the abandonment of the one silane product because of "potential health hazards" and the choice between two others). We believe that the assessment of relevant documentation and witness testimony presents a genuine question of material fact.[4]

A third element of the manufacturing process involves a quality control test that Luzenac uses to check whether the talc is uniformly coated. Luzenac claims that one of its employees discovered a novel, inexpensive technique that uses existing equipment originally designed for a completely different purpose. The senior technical manager in

---

[4] Mr. Hertz also points out that in 2004, while this lawsuit was pending, a Luzenac employee disclosed the type of silane to an outsider, without a secrecy agreement. While this argument might be relevant to liability, it is not material to whether Mr. Hertz misappropriated Luzenac's trade secret during his negotiations with IMI Fabi.

charge of developing 604AV, Oscar Noel, stated in his deposition that Luzenac treated the test as "highly confidential." Aplt. App. Vol. V, at 1702. However, Mr. Hertz submitted an affidavit of a technical manager at Luzenac, Todd Yonker, who stated that he routinely demonstrated the test to potential customers. Aplt. App. Vol. IV, at 1251. We can see no way to resolve this issue without weighing the credibility of the parties' witnesses. The district court, therefore, erred in crediting the testimony of Mr. Yonker over that of Mr. Noel. *See Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) ("It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment.").

Our analysis of the individual elements of the 604AV manufacturing process bolsters our conclusion that when we apply the correct framework for evaluating a trade secret claim, Mr. Hertz has not satisfied the standard for summary judgment. Mr. Hertz's counsel asserted at oral argument that the trade secret could be found in its combination in four documents. "[A] discoverer of a trade secret may forfeit protection if the entire combination of its aspects is disclosed in several publications." 1 Milgrim & Benson, *supra*, § 1.03, at 1-281 (citing cases from various jurisdictions). We have considered all of these documents. We also have conducted our own comprehensive review of the record. As suggested by the discussion above, the production process of 604AV is not contained as a whole within the four documents to which Mr. Hertz refers; nor can it be indisputably discovered through the consideration of additional documents available to us. Disputes exist over questions of material fact at both the individual element level as

-14-

well as in the process of combining the various steps to create 604AV. Mr. Hertz cannot win on summary judgment simply by saying that a good mechanic could assemble various pieces of public information and, given enough time and resources, build a product like that of 604AV. "The concept of a 'good mechanic' . . . should not be dispositive to prove lack of secrecy in a trade secret matter." *Id.* at 1-279 to -280.

### 3. The Precautions Taken by Luzenac

One factor to consider in determining whether a trade secret exists is "the precautions taken by the holder of the trade secret to guard the secrecy of the information." *Colo. Supply*, 797 P.2d at 1306. While the district court did consider evidence relating to these steps, it did *not* view the evidence in the light most favorable to Luzenac. It focused on the steps that Luzenac did not take, rather than evaluate whether the steps that Luzenac did take were reasonable.

In order to claim protection of a trade secret, "'the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.'" *Harvey Barnett*, 338 F.3d at 1129 (quoting Colo. Rev. Stat. Ann. § 7-74-102(4)). Such measures must be "reasonable under the circumstances to maintain its secrecy." *Colo. Supply*, 797 P.2d at 1306 (citing *Network Telecomms., Inc. v. Boor-Crepeau*, 790 P.2d 901 (Colo. Ct. App. 1990)). However, "[e]xtreme and unduly expensive procedures need not be taken." *Id.*

Luzenac took a series of steps to protect the secrecy of the manufacturing of 604AV. In particular, it: (1) posted signs warning employees to keep the production

process of 604AV confidential; (2) required key employees, including Mr. Hertz, to sign confidentiality agreements; (3) barred visitors to the plant from viewing the production process; (4) marked certain documents about the production process as confidential; and (5) subjected contractors like VHM to confidentiality agreements.

The district court simply dismissed Luzenac's actions as "ceremonial" in nature. Aplt. App. Vol. X, at 3271. The district court noted that Luzenac failed to have confidentiality agreements with all of its customers. It also faults Luzenac for failing to control VHM's disclosures of the process for 604AV.

However, there always are more security precautions that can be taken. Just because there is something else that Luzenac *could* have done does not mean that their efforts were unreasonable under the circumstances. In light of undisputed precautions that Luzenac took, we do not think that the record demonstrates beyond dispute that Luzenac's measures to protect the secrecy of 604AV were merely "superficial." Aplt. App. Vol. IX, at 3004; *cf. Haggard v. Spine*, No. 09-cv-721-CMA-KMT, 2009 WL 1655030, at *9 (D. Colo. June 12, 2009) (applying UTSA and holding that the previous employer had presented sufficient evidence that it had taken reasonable measures to protect the confidentiality of its trade secret when one such measure was requiring anyone involved with product development to sign a nondisclosure agreement). Whether these precautions were, in fact, reasonable, will have to be decided by a jury.

We find multiple issues of material fact surrounding the secrecy of the production process of 604AV. The district court erred by making multiple determinations of fact on

a motion for summary judgment.  Accordingly, we reverse and remand this claim.

**B.  Is Luzenac's Customer Information a Protectable Secret?**

Luzenac accuses Mr. Hertz and Mr. Lighthart of taking confidential documents relating to Luzenac's actual and prospective customers when they left Luzenac and supplying this information to IMI Fabi.  Specifically, Luzenac alleges that Mr. Hertz disclosed to IMI Fabi via e-mail detailed information about Luzenac's customers and prospective customers contained in documents that Mr. Lighthart had taken from Luzenac.  One document contains information regarding twenty-nine 604AV customers and potential customers, including the names of the companies, their location, their applications for 604AV, projected annualized volume of purchases, and the status[5] of customer testing and approval of the product.  Mr. Hertz concedes that he received this document from Mr. Lighthart, who prepared it while employed with Luzenac.  Mr. Lighthart also gave Mr. Hertz a document he alleges he prepared specifically for IMI Fabi.  This document lists information about thirty-three potential Genera customers, including company names, contact names, addresses, and applications.  It is unclear from the record whether this information was misappropriated from Luzenac's customer information.

Colorado recognizes that a customer list can be a trade secret under the UTSA.

---

[5]     The document grouped the customers into three categories based on the status of 604AV testing: (1) 604AV is approved and in commercialized coating; (2) 604AV is approved in formulation, is approved in coating in customer trial, or is waiting for sales; and (3) 604AV is in promising laboratory testing.

*Network Telecomms.*, 790 P.2d at 902. Trade secret is defined to include the "listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." Colo. Rev. Stat. Ann. § 7-74-102(4); *Network Telecomms.*, 790 P.2d at 902. Contrary to Mr. Hertz's contentions, we read the broad language of the UTSA as including both actual and prospective customer lists, since both can be of value to the owner. *Cf. Ovation Plumbing, Inc. v. Furton*, 33 P.3d 1221, 1224-25 (Colo. Ct. App. 2001) (holding that the definition of "trade secret" in the UTSA, together with evidence of value and of measures to protect disclosure, is broad enough to include a bid on a contract).

In analyzing whether a particular customer list is a trade secret, we must apply the *Colorado Supply* factors discussed above. *Colo. Supply*, 797 P.2d at 1306; *see also Network Telecomms.*, 790 P.2d at 903 (applying the same factors). The district court concluded that Luzenac's customer list was not a trade secret because it did not contain any confidential information. In reaching this conclusion, the district court considered the deposition testimony of several Luzenac employees. The district court also noted that electronic customer information was only accessible by the customer service agent who worked with that customer. It acknowledged the testimony of Barrett Fisher, supervisor of sales and finance for VHM, and Jerry Gauntt, a Luzenac salesperson, indicating how much time it took to develop the customer list. The district court's ultimate determination relied, however, on the fact that the customer information was derived from public sources. It did not consider conflicting testimony that indicated that Luzenac's customer

-18-

lists were only circulated to ten to twenty senior managers and salespeople within the company. With respect to Luzenac's instruction to its employees to keep all information confidential, the district court dismissed this measure by stating that "this impracticable, blanket prohibition does not constitute a reasonable attempt at secrecy and the evidence is undisputed that Luzenac employees ignored it of necessity." Aplt. App. Vol. IX, at 3005-06.

We believe that the district court imposed its own determinations for those that should be made by a jury. "What constitutes a trade secret is a question of fact . . . ." *Colo. Supply*, 797 P.2d at 1306. Whether Luzenac's customer list was easily ascertainable from public sources and whether Luzenac took reasonable means to guard the secrecy of this list ordinarily would be questions for a jury. Our review of the record indicates that the answers to these questions are disputed issues of fact and cannot be easily determined from the record before us.

We note several examples of disputed facts relevant to the determination of the trade secret status of Luzenac's customer list. First, we have not found any evidence that a readily available public source would contain the identities of Luzenac's actual and prospective customers. The general information about each company in the customer list may be publicly available. But Luzenac claims to have created a list of fewer than twenty customers from a universe of a thousand or more potential customers. Luzenac spent

anywhere from weeks to years developing those customer relationships.[6] A customer list can be a trade secret when it is the end result of a long process of culling the relevant information from lengthy and diverse sources, even if the original sources are publicly available. *See Conseco Fin. Servicing Corp. v. N. Am. Mortgage Co.*, 381 F.3d 811, 819 (8th Cir. 2004) (holding that the company's "lead sheets" are trade secrets, despite the fact that they are based largely on public records); *cf. Hickman v. Taylor*, 329 U.S. 495, 511-13 (1947) (holding that an attorney's notes of an interview with a witness is work product, even though the opposing party is free to interview the same witness, because there is a difference between what the witness observed and what the attorney "saw fit to write down"); *Haggard*, 2009 WL 1655030, at *9 (holding that the previous employer had presented sufficient evidence that its customer information, which took years to develop and was "organized in a unique manner," was entitled to trade secret protection under UTSA despite the fact that many of the sources of the information were publicly available) .

We also conclude that at least some of the information contained on Luzenac's customer list may not be publicly available. While the names, locations, and applications for any potential customers of vinyl silane-treated talc could be available from a variety of resources—e.g., trade publications, the Harris Directory, and the Thomas Register—we do not find evidence (at a minimum) that the status of 604AV testing and

---

[6] Much of this time allegedly was required to identify the appropriate contact person who could make the decision to buy 604AV.

Luzenac's contact person at each company was public.[7]  Accordingly, we believe that a number of facts relevant to the trade secret status of Luzenac's customer list are disputed and should go to a jury.

On remand, a number of considerations may be put before the jury in assessing the trade secret status of Luzenac's customer list.  The *Colorado Supply* court enumerated several distinct elements considered by other jurisdictions in making this determination.  *See Colo. Supply*, 797 P.2d at 1306-07.  These include: (1) whether proper and reasonable steps were taken by the owner to protect the secrecy of the information; (2) whether access to the information was restricted; (3) whether employees knew customers' names from general experience; (4) whether customers commonly dealt with more than one supplier; (5) whether customer information could be readily obtained from public directories; (6) whether customer information is readily ascertainable from sources outside the owner's business; (7) whether the owner of the customer list expended great cost and effort over a considerable period of time to develop the files; and (8) whether it would be difficult for a competitor to duplicate the information.  *See id.* (citing cases from various jurisdictions).  We believe that such factors are material to the determination of whether a customer list is a trade secret and, therefore, must be considered by a jury.

We also note that "[t]here is no requirement in Colorado's Uniform Trade Secrets Act that there be actual use or commercial implementation of the misappropriated trade

---

[7]    It also is a disputed question of fact whether the projected volume of purchases was public.

secret for damages to accrue. Misappropriation consists only of the improper disclosure or acquisition of the trade secret." *Sonoco Prods. Co. v. Johnson*, 23 P.3d 1287, 1290 (Colo. Ct. App. 2001) (citing Colo. Rev. Stat. Ann. § 7-74-102(2)(a), (b)). Accordingly, we find Mr. Hertz's argument that there is no evidence that IMI Fabi benefitted from Luzenac's customer information to be irrelevant to the questions of whether Mr. Hertz misappropriated Luzenac's customer list, and whether this customer list is a trade secret.[8]

## C. Breach of Contract and Conspiracy Claims

Colorado recognizes a claim for breach of contract regarding an employee who was bound to confidentiality. *See Mulei v. Jet Courier Serv., Inc.*, 739 P.2d 889, 892 (Colo. Ct. App. 1987) ("Only confidential information acquired during the course of employment may be protected, not the general knowledge of a business operation. Information already known to competitors or readily ascertainable elsewhere cannot be protected as confidential." (citation omitted)), *rev'd in part*, 771 P.2d 486 (Colo. 1989). Thus, even if Luzenac fails to establish its claims under the UTSA, it still may have a breach of contract claim. Mr. Hertz signed a confidentiality agreement in which he agreed not to disclose confidential and proprietary information during or after termination

---

[8] Apparently arguing that the customer list was no longer of value to Luzenac, Mr. Hertz contends that Luzenac had disclosed to some of its customers in 2001 that it had stopped producing 604AV. Luzenac disputes the relevance of this fact, pointing out that it shifted its production to Huber, a contract manufacturer, and then later to VHM, using the same materials and production process for 604AV. Since this dispute relates to the value of the customer list and Luzenac's competitive advantage, *not* secrecy, we leave it for the district court to resolve in the first instance.

of his employment with Luzenac. The confidentiality agreement executed by Mr. Hertz provided:

> In consideration of employment with Luzenac America, Inc., you agree that during and after your employment with Luzenac America, you will not divulge or appropriate to your own use or to the use of others any secret or confidential information or knowledge obtained by you during employment with Luzenac America. This restriction shall not apply to information which is or becomes part of the public domain through no breach of any obligation of confidentiality, or was known or possessed by you prior to beginning employment with Luzenac America.

Aplt. App. Vol. IV, at 1301.

Because the district court concluded that Luzenac did not take steps to emphasize the confidentiality of 604AV and its customer information, the court did not conduct any factual analysis specifically regarding the breach of contract claim. While analysis of this claim would not take the same form as the analysis of the trade secret claim—that is, it would not apply the *Colorado Supply* factors—it would still look to whether the steps taken by Luzenac to protect secrecy and confidentiality were sufficient to convey that the manufacturing process of 604AV was confidential information. Since the agreement was not specific as to what information was confidential, the relevant factual questions include: (1) whether Luzenac made it clear that the manufacturing process for 604AV and Luzenac's customer information were confidential, and (2) whether the information used by Mr. Hertz was exclusively in the public domain or known to him prior to his employment with Luzenac. Accordingly, we remand this claim for further proceedings.

Similarly, Luzenac's conspiracy claim also depends on the factual findings already

discussed in its misappropriation of trade secret claims. "A civil conspiracy is a combination of two or more persons who, by some concerted action, seek either to accomplish an unlawful purpose or to accomplish some lawful purpose by criminal or unlawful means." *Mulei*, 739 P.2d at 894. *Powell Products, Inc. v. Marks*, 948 F. Supp. 1469 (D. Colo. 1996), recognized that if a plaintiff alleges that particular defendants conspired to misappropriate trade secrets, this claim is not preempted by the UTSA. *Id.* at 1474. If a jury were to decide that Luzenac's process for 604AV, customer information, or both, are trade secrets, then Mr. Hertz and Mr. Lighthart could be charged with conspiracy. Accordingly, we remand this claim to the district court.

## D. Mr. Hertz's Claim for Abuse of Process

Mr. Hertz appeals from the denial by the district court of his motion to amend his complaint to add a claim for abuse of process. Mr. Hertz alleged that Luzenac abused the legal process by litigating against him in order to ruin his livelihood. Specifically, Mr. Hertz stated in his proposed amended complaint that:

> The principal reason for filing the Counterclaims was other than to recover amounts that it believes that Hertz owes to it as a result of the allegations in the Counterclaims. Instead, the principal reason for filing the Counterclaims is to retaliate against Plaintiff, to harass and intimidate Plaintiff, to cause Plaintiff to cease his lawful competition with Defendant, to prevent Plaintiff from making a living, and to ruin his reputation.

Aplt. App. Vol. I, at 156-57, ¶ 47.

The district court held that Mr. Hertz failed to allege improper use of process and, therefore, did not satisfy the requirements to allege an abuse of process claim. Based on

-24-

this determination, the district court concluded that amendment of the complaint would be futile. We review the district court's decision to deny leave to amend a complaint for an abuse of discretion. *Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1113 (10th Cir. 2007). "Although Fed.R.Civ.P. 15(a) provides that leave to amend shall be given freely, the trial court may deny leave to amend where amendment would be futile." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1126 (10th Cir. 1997). "[W]hen denial is based on a determination that amendment would be futile, our review for abuse of discretion includes de novo review of the legal basis for the finding of futility." *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1249 (10th Cir. 2009); *cf. Grossman*, 120 F.3d at 1126 (noting that if the stated reasons for dismissing on futility grounds "are incorrect as a matter of law, the district court will be found to have abused its discretion in dismissing the claim with prejudice").

A claim for abuse of process requires proof of: "(1) an ulterior purpose for the use of a judicial proceeding; (2) willful action in the use of that process which is not proper in the regular course of the proceedings, i.e., use of a legal proceeding in an improper manner; and (3) resulting damage." *Lauren Corp. v. Century Geophysical Corp.*, 953 P.2d 200, 202 (Colo. Ct. App. 1998); *cf. Satterfield v. Ennis*, No. 08-cv-751-ZLW-CBS, 2008 WL 3910995, at *1 & n.6 (D. Colo. Aug. 25, 2008) (citing *Lauren Corp.*). "If the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint there is no abuse, even if the plaintiff had an ulterior motive in bringing the action or if he knowingly brought suit upon an unfounded claim." *James H.*

-25-

*Moore & Assocs. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 373 (Colo. Ct. App. 1994) (emphasis omitted) (quoting *Inst. for Prof'l Dev. v. Regis Coll.,* 536 F. Supp. 632, 635 (D. Colo. 1982)); *see also* Restatement (Second) of Torts § 682 cmt. b (1977) ("[T]here is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant."); *cf. Johnstown Feed & Seed, Inc. v. Cont'l W. Ins. Co.*, No. 07-cv-290-MSK-CBS, 2009 WL 564274, at *6 (D. Colo. Mar. 5, 2009) (citing *James H. Moore*). Moreover,

> Use of a legal proceeding in an improper *manner* is an essential element of an abuse of process claim.
>
> Thus, although the litigant's motive may be important in determining whether there was an "ulterior purpose" for the use of the process, it still must be established that, viewed objectively, there was an improper *use* of the process.

*James H. Moore*, 892 P.2d at 373 (citation omitted).

A litigant uses the legal proceeding in an improper manner when he seeks to use the process to accomplish a coercive goal. *Walker v. Van Laningham*, 148 P.3d 391, 394 (Colo. Ct. App. 2006) (citing *Palmer v. Tandem Mgmt. Servs., Inc.*, 505 N.W.2d 813, 817 (Iowa 1993) ("The improper purpose is ordinarily an attempt to secure from another some collateral advantage not properly includable in the process itself and is a form of extortion in which a lawfully used process is perverted to an unlawful use.")).

> The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the

use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

W. Page Keeton et al., *Prosser and Keeton on Torts* § 121, at 898 (5th ed. 1984).

Mr. Hertz's claim of abuse stems from Luzenac filing counterclaims against him for misappropriation of trade secrets. Any ulterior motives Luzenac might have had are insufficient to support an inference of improper use. Viewed under the standards discussed above, we agree with the district court that Mr. Hertz has failed to allege an improper purpose. Luzenac is entitled to protect its trade secrets. Its counterclaims are an appropriate means of accomplishing that goal. We do not find any evidence that Luzenac has misused the legal process or done anything other than endeavor to protect its perceived legitimate competitive interests. Mr. Hertz has not identified any "collateral advantage" to be gained by Luzenac.[9] Accordingly, the district court did not abuse its discretion in denying Mr. Hertz's motion to amend his complaint to include a claim for abuse of process.

**E. Mr. Hertz's Tortious Interference Claims**

---

[9]    If Luzenac ultimately succeeds on its misappropriation claims, Mr. Hertz may be forced to cease competing with Luzenac. As a result, Mr. Hertz asserts that he may be prevented from making a living in his chosen field and his reputation may be ruined. Aplt. App. Vol. I, at 156-57, ¶ 47. All of this, however, is a natural and not unexpected consequence of a successful lawsuit. *See Walker*, 148 P.3d at 395 ("Any advantages that [the plaintiffs] may have obtained as a result of [the defendant's convictions] were regular and legitimate goals which the proceedings were designed to achieve.").

Mr. Hertz also appeals the dismissal of his claims for tortious interference with contract and tortious interference with prospective business advantage. Under his contract with IMI Fabi, Mr. Hertz was to receive a percentage of the profits from the sale of Genera. Mr. Hertz alleges that Luzenac's allegations of misappropriation of trade secrets and threats of litigation induced IMI Fabi to stop selling Genera and to thereby "render less performance than it otherwise would have." Hertz Br. at 74. Mr. Hertz also contends that Luzenac's actions caused IMI Fabi to cancel all future projects with Mr. Hertz. The district court dismissed these claims on the grounds that Mr. Hertz could not prove that IMI Fabi had breached its contract and that Mr. Hertz could not reasonably expect any prospective business advantage. We agree.

To sustain a claim of intentional interference with contract, the plaintiff must prove that the defendant (1) was aware of the existence of the contract; (2) intended that one of the parties breach the contract; (3) induced the party to breach the contract or make it impossible for him or her to perform; and (4) acted "improperly" in causing the breach. *Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859, 871 (Colo. 2004). In particular, the contract must be breached. If the contract has been fully performed, then there has been no interference. *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n*, 577 P.2d 748, 751 (Colo. 1978) ("The petitioner cannot recover for the alleged tortious interference with a contract because the agreement was nonexclusive in nature and had not been breached.").

Mr. Hertz concedes that IMI Fabi did not breach its contract. IMI Fabi was not

required to sell any particular amount of Genera, or even to sell any at all.[10]  Instead, Mr.

Hertz argues that although IMI Fabi fully performed its obligations under the contract, it

would have *more fully* performed but for Luzenac's actions.  The Supreme Court of

Colorado previously has rejected such an argument.  In *Radiology Professional Corp.*, the

plaintiff contracted to provide radiology services to a hospital.  577 P.2d at 749-50.

When the hospital hired other radiologists, the plaintiff sued for tortious interference with

contract, arguing that the other radiologists caused the hospital to use its services less than

it otherwise would have.  The court interpreted the contract as being nonexclusive and

concluded that, since the hospital had the right to hire other radiologists and did not

breach the contract, the plaintiff could not recover.  *Id.* at 750-51.  This case is analogous.

The fact that Mr. Hertz may realize *less profit* as a result of Luzenac's actions is not

sufficient to support his claim of tortious interference with contract.  Because Mr. Hertz

---

[10]        Mr. Hertz argued before the district court that IMI Fabi breached the
implied covenants of good faith and fair dealing imposed by Colorado law in every
contract.  *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) ("The duty of good
faith and fair dealing applies when one party has discretionary authority to determine
certain terms of the contract, such as quantity, price, or time."); *cf. Zeiler Farms, Inc. v.
Anadarko E & P Co.*, No. 07-cv-1985-WYD-MJW, 2009 WL 890716, at *5 (D. Colo.
Mar. 31, 2009) (citing *Amoco Oil Co.*).  However, on appeal Mr. Hertz has not argued
that the duty of good faith applies, nor has he presented any evidence that would establish
that he had any expectation as to the amount of Genera that would be sold.  *See Amoco
Oil Co.*, 908 P.2d at 498 ("The good faith performance doctrine is generally used . . . to
honor [the parties'] reasonable expectations.").  We decline to read more into Mr. Hertz's
contract than he, himself, has advocated for.  *See* Fed. R. App. P. 28(a)(9)(A) ("The
appellant's brief must contain . . . appellant's contentions and the reasons for them, with
citations to the authorities and parts of the record on which the appellant relies[.]"); Fed.
R. App. P. 28.1(c)(2) (requiring cross-appellant's principal brief to comply with Fed. R.
App. P. 28(a)).

has conceded that IMI Fabi has not breached the contract, his claim must fail.

Similarly, Colorado recognizes the tort of intentional interference with prospective business relations. *MDM Group Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 886 (Colo. Ct. App. 2007). "One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation . . . ." *Id.* (quoting Restatement (Second) of Torts § 766B (1979)). "While the existence of an underlying contract is not required for this tort, there must be a showing of improper and intentional interference by the defendant that prevents the formation of a contract between the plaintiff and a third party." *Id.*; *cf. Puls v. Landmark Cmty. Newspapers, Inc.*, No. 08-1263, 2009 WL 1927442, at *10 (10th Cir. July 7, 2009) (citing *MDM Group Associates, Inc.*). However, the plaintiff must show that there is "a reasonable likelihood or probability that a contract would have resulted; there must be something beyond a mere hope." *Klein*, 44 F.3d at 1506.

Mr. Hertz cannot prove that he had more than "a mere hope" of entering into any future business deals with IMI Fabi. Mr. Hertz's claim that he had a reasonable probability of enjoying a prospective business advantage rests primarily on an e-mail that he sent to IMI Fabi proposing to develop a new talc product for use in the rubber industry. IMI Fabi acknowledged that it was looking at developing new products, but responded that it had "other priorities" at the moment and would not be able to consider Mr. Hertz's

proposal until at least several months later.[11]  Aplt. App. Vol. VII, at 2537.  Moreover,

IMI Fabi replied that it needed more time to evaluate the profitability of Genera.  *Id.*

Even viewing the evidence in the light most favorable to Mr. Hertz, we cannot say that

IMI Fabi's response was anything more than lukewarm.  While Mr. Hertz certainly

wanted to establish a continuing relationship with IMI Fabi, there is no evidence to

suggest that IMI Fabi shared Mr. Hertz's desire.  No jury could conclude from this e-mail

exchange that Mr. Hertz had a reasonable probability of entering into a future contract.

Therefore, the district court correctly dismissed Mr. Hertz's claim of tortious interference

with prospective business advantage.

### CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's order dismissing

Luzenac's claims for (a) misappropriation of the trade secret of 604AV's production

process, (b) misappropriation of customer information, (c) breach of contract, and (d)

conspiracy; these claims are **REMANDED** for further proceedings consistent with this

opinion.  We **AFFIRM** the district court's order denying Mr. Hertz's motion to add a

---

[11]  Mr. Hertz also relies on the deposition of Scott Baker of IMI Fabi. However, the relevant portion of Mr. Baker's deposition largely repeats what was conveyed in the e-mail correspondence—that Mr. Hertz had proposed developing a new product, that the product is of the kind that IMI Fabi might be interested in, but that IMI Fabi was not in a position to consider the proposal.  Mr. Baker did state that IMI Fabi intended to wait until this lawsuit was resolved before deciding whether to move forward with any future plans involving Mr. Hertz.  But that is not relevant to the antecedent question of whether there was a reasonable probability, *prior to Luzenac's involvement*, that Mr. Hertz and IMI Fabi would enter into any future contracts.

-31-

claim for abuse of process.  Lastly, we **AFFIRM** the district court's order dismissing Mr.

Hertz's claims for tortious interference with contract and tortious interference with

prospective business advantage.