FILED
United States Court of Appeals
Tenth Circuit

August 5, 2025

Christopher M. Wolpert
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

JOHN SNYDER,

    Plaintiff - Appellant,

v.

BEAM TECHNOLOGIES, INC.,

    Defendant - Appellee.

No. 24-1136

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:20-CV-03255-NYW)**

_____

Spencer J. Kontnik (Austin M. Cohen and Matthew L. Fenicle with him on the briefs), of Kontnik Cohen, LLC, Denver, Colorado, for Plaintiff-Appellant.

Donald E. Lake, III, of Dickinson Wright PLLC, Denver, Colorado, for Defendant-Appellee.

_____

Before **MATHESON**, **BACHARACH**, and **FEDERICO**, Circuit Judges.

_____

**FEDERICO**, Circuit Judge.

_____

In most cases involving a claim for trade secret misappropriation, an employer sues its former employee (and possibly their new employer) for allegedly stealing a trade secret, such as a customer list. This case, however,

presents the inverse of that fact pattern. Plaintiff John Snyder filed suit against his former employer, Beam Technologies, Inc. He alleged two claims for misappropriation of trade secrets and several state law claims arising out of his employment at Beam.

The district court granted summary judgment on Snyder's two trade secret claims. It held that Snyder offered insufficient evidence to show that he "owned" the alleged trade secret, a customer list. It also granted a motion to exclude Snyder's damages expert witness under Federal Rule of Evidence 702, which governs the admissibility of expert witnesses. In the order granting that motion (the Rule 702 Order), the district court not only excluded Snyder's expert witness, but it also precluded Snyder from offering evidence or presenting any witnesses, including fact witnesses, on lost wages.

Snyder appeals both the trade secret summary judgment ruling and the Rule 702 Order blocking him from offering any evidence or fact witnesses on lost wages. We have jurisdiction over the final judgment under 28 U.S.C. § 1291 and grant Snyder partial relief.

## I

Between August and November 2018, Snyder was employed by Beam as a Regional Director of Broker Success. Prior to joining Beam, from

2

approximately December 2006 to August 2016, Snyder worked for Guardian Life Insurance Company.

While working for Guardian, Snyder acquired a national customer list of over 40,000 insurance broker names (the Guardian Broker List). In February 2015, while still a Guardian employee, Snyder downloaded this national customer list from Guardian's client-relationship-management software, known as Seibel, to a Microsoft Excel spreadsheet titled as "Guardian Broker List 2.19.2015.xlsx" (the Guardian Broker List ).[1] Later that same day, Snyder attached the Guardian Broker List to an email he sent to himself from his Guardian work email to his personal Hotmail account. All the customer information on the Guardian Customer List was taken from Guardian's files. The metadata showed that Snyder last modified the Guardian Broker List only "three minutes after it was created[,]" Aplt. App. V at 190, which confirms he made no meaningful additions after he downloaded it from Guardian's files.

Guardian terminated Snyder's employment in August 2016 for reasons left unexplained to us. After being unemployed from August 2016

---

[1] Snyder created several derivative spreadsheets from the Guardian Broker List. The district court's summary judgment decision refers to the full, nationwide list of over 40,000 brokers contained in a spreadsheet as "Spreadsheet Number 4." *See* Aplt. App. V at 189–90 n.6. We refer to Spreadsheet Number 4 – whether on its own or included as a tab in other derivative spreadsheets Snyder created – as the Guardian Broker List.

to at least July 2018, Snyder accepted Beam's offer of employment in August 2018. At that time, Snyder lived in Arizona, and the parties signed a Relocation Agreement (entitling Snyder to a $30,000 moving allowance) for Snyder to move to Colorado. Snyder also claims that "[t]o induce" him to "work for Beam and to disclose the [Guardian Broker List], Beam promised to pay" him "for the spreadsheets 'off the books.'" Op. Br. at 8.

Using the Guardian Broker List as a template, Snyder created three new spreadsheets. He named these derivative documents as Spreadsheets Number 8 (the Texas list), 9 (the Utah list), and 10 (the Colorado list). Each of these state-specific lists was supposed to contain only the names of the brokers in each respective state. Snyder claims that he intended to send each state-specific list to different sets of Beam employees based on which states those Beam employees were targeting. But he accidentally included the full Guardian Broker List "as a separate tab" in all three of these new spreadsheets, which he attached to each of his three emails. Aplt. App. V at 191. This resulted in the complete disclosure of the Guardian Broker List to every Beam employee who received his three emails.

When Snyder sent these critical emails, he did so without any safeguards or effort to maintain secrecy. He did not mark any of the three new spreadsheets or the Guardian Broker List as confidential or a trade secret, did not limit Beam employees or anyone else's access to any of these

4

documents, did not password protect any of these documents, and did not inform Beam that any of these customer lists was confidential or a trade secret.

After Snyder learned that he had accidentally distributed the Guardian Broker List to numerous Beam employees, "Snyder did not object to Beam's use of the broker contacts or attempt to claw back the materials." Aplt. App. V at 192. Nor did he advise Beam that he considered any of these documents a trade secret. Instead, Snyder ratified what he now claims he shared with Beam accidentally, telling Beam's CEO that he had purposefully shared the Guardian Broker List with the numerous Beam recipients. A few months later, in November 2018, Snyder was terminated by Beam, again for reasons not explained.

In October 2020, Snyder filed a lawsuit against Beam in the United States District Court for the District of Colorado for trade secret misappropriation, as well as several state law claims targeting Beam's actions leading up to and during his employment. He filed an amended complaint in February 2021, with federal question jurisdiction predicated on a Defend Trade Secrets Act (DTSA) claim and supplemental jurisdiction over the Colorado state law claims.

When Beam filed a partial motion for summary judgment, Snyder had five operative claims: (1) violation of the DTSA, 18 U.S.C. § 1836 et seq.;

(2) violation of the Colorado Uniform Trade Secrets Act (CUTSA), Colo. Rev. Stat. § 7-74-101 et seq.; (3) violation of a Colorado statute barring an employer from obtaining workers by misrepresentation, Colo. Rev. Stat. § 8-2-104;[2] (4) fraudulent misrepresentation; and (5) promissory estoppel.

Beam's motion for summary judgment presented three arguments against the trade secret claims, Claims One and Two. Beam argued that: (1) Snyder failed to present sufficient evidence that he owned the Guardian Broker List; (2) Snyder failed to present sufficient evidence that he took reasonable measures or efforts to safeguard the Guardian Broker List; and (3) Beam did not misappropriate the Guardian Broker List from Snyder; rather, Snyder voluntarily emailed it to several Beam employees.

The district court granted the motion for summary judgment on the trade secret claims. In doing so, it only reached Beam's first argument on the trade secret claims. It concluded that "even viewing the evidence in the light most favorable to Mr. Snyder, he has not directed the [district court] to evidence from which a reasonable jury could conclude that he owned [the Guardian Broker List], a necessary element of his misappropriation

---

[2] This Colorado statute is construed as a fraud claim against an employer. *See Nelson v. Gas Rsch. Inst.*, 121 P.3d 340, 344 (Colo. App. 2005) ("The elements a plaintiff must establish to sustain an action under § 8–2–104 are the same as those for common law fraud.").

6

claims." Aplt. App. V at 206. As a result, it granted summary judgment to Beam on both Claims One and Two.

On Claim Three (obtaining a worker by misrepresentation), the district court denied summary judgment. It rejected Beam's argument that Snyder was not covered by the statute "simply because he was unemployed when he accepted Beam's offer of employment." *Id.* at 209. It also rejected Beam's alternative argument concerning the sufficiency of the evidence in support of this claim, holding that Snyder offered enough evidence "to create a genuine dispute of material fact as to whether Beam improperly induced him to move from Arizona to Colorado through false or deceptive representations." *Id.* at 211.

Finally, on Claims Four (fraudulent misrepresentation) and Five (promissory estoppel), Beam sought summary judgment based on the affirmative defense of unclean hands. Largely because Beam's briefing and argument on this point was "cursor[y]" and undeveloped, the district court denied summary judgment on this affirmative defense. *Id.* at 213.

Both parties had also filed motions under Federal Rule of Evidence 702 to exclude certain expert witnesses from testifying at trial. In its summary judgment decision, the district court directed the parties to file a status report by July 2023 regarding how the summary judgment rulings affected the proposed expert witness testimony to be offered at trial. For

example, any testimony regarding trade secrets or damages from trade secret misappropriation became off-limits because the two trade secret claims failed at summary judgment. But Snyder's expert – Nicholas Adamy – was also expected to testify regarding "economic damages issues arising out of" claims based on Snyder's employment with Beam. Aplt. App. V at 214 (citations omitted).

The parties conferred and filed a joint status report, advising the court that they would submit revised reports for their competing damages experts.

The district court then decided Beam's motion to exclude Snyder's damages expert, Adamy, under Rule 702. It granted the motion and excluded Adamy from supporting Snyder's alleged damages presentation for Claims Three, Four, and Five (fraudulent misrepresentation, obtaining a worker by misrepresentation, and promissory estoppel). Before analyzing Beam's arguments, the district court acknowledged that "while this argument is framed as an argument challenging Mr. Adamy's opinions under Rule 702, the argument goes to the substantive merits of Mr. Snyder's requested relief and would have been more appropriately raised at the summary-judgment stage." *Id.* at 225. It then stated that "neither [p]arty suggests that the [c]ourt cannot resolve this issue on the papers here." *Id.* It cited Federal Rule of Civil Procedure 1 and held that "[b]ecause the

[p]arties have had an adequate opportunity to brief this issue and have done so, the [c]ourt will address the [p]arties' arguments here." *Id.* at 226.

The district court reviewed each of the three claims, analyzing the facts in the record and the law to conclude that Snyder failed to show that he could obtain lost wages damages on any of the claims. It granted the motion to exclude Adamy as an expert from testifying at trial. But it spent the bulk of the Rule 702 Order analyzing the evidence in the record and the law underlying the three claims for relief at issue, and it significantly broadened its holding beyond the exclusion of one expert witness, stating: "[t]o be clear, this [c]ourt will not permit any evidence or argument as to lost wages, regardless of the witness." *Id.* at 234 n.6. In other words, it excluded all evidence and fact witnesses on lost wages damages at trial, not simply the one expert witness Beam challenged under Rule 702.

Snyder filed a motion to reconsider the Rule 702 Order. He argued that the district court's Rule 702 Order effectively entered summary judgment instead of merely excluding a single expert witness under Rule 702. The district court disagreed and denied that motion.

As a result of the Rule 702 Order, Snyder was not permitted to offer any evidence or witnesses to prove his alleged lost wages on any of his three remaining claims. This led Snyder and Beam to settle the promissory estoppel claim, and they jointly asked the district court to dismiss the two

9

remaining claims in a joint motion for entry of final judgment. The district court granted that relief, dismissing the remaining claims and ordering the entry of final judgment. Snyder timely appealed.

## II

"We review the district court's summary judgment decision de novo, applying the same standards as the district court." *Klein v. Roe*, 76 F.4th 1020, 1028 (10th Cir. 2023) (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1046 (10th Cir. 2017)). Summary judgment is properly granted when the record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1108 (10th Cir. 2009) (quoting Fed. R. Civ. P. 56(a)). In our summary judgment review, "we examine the evidence and draw reasonable inferences therefrom in the light most favorable to the non-moving party." *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003).

"To determine whether a 'genuine issue' as to a material fact exists, we consider 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Klein*, 76 F.4th at 1028 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). But it is well settled that "[m]ere allegations unsupported by further evidence . . . are insufficient

10

to survive a motion for summary judgment." *Id.* (quoting *Potts v. Davis Cnty.*, 551 F.3d 1188, 1192 (10th Cir. 2009)). Likewise, "the 'mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Klein*, 76 F.4th at 1028 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Anderson*, 477 U.S. at 247–48 (same).

### III

We address both issues raised by Snyder, beginning with the trade secret claims, and then reaching the Rule 702 Order.

### A

Under both the CUTSA and DTSA, the plaintiff has the burden to "identify the trade secrets" at issue and to "show[] they exist." *Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1088 (10th Cir. 2025) (collecting cases) (quoting *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020)).

To prevail on a claim under the CUTSA, a plaintiff must prove "[1] that he or she possessed a valid trade secret, [2] that the trade secret was disclosed or used without consent, and [3] that the defendant knew, or should have known, that the trade secret was acquired by improper means." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir.

11

1993). The CUTSA "defines a trade secret as 'any scientific or technical information, design, process, procedure, formula, [or] improvement . . . which is secret and of value.'" *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003) (quoting Colo. Rev. Stat. § 7–74–102(4)). And to maintain its status, a trade secret must be protected by measures and efforts that are considered "reasonable under the circumstances to maintain its secrecy." *Hertz*, 576 F.3d at 1112 (quoting *Colorado Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990)). Ultimately, trade secret status "is a question of fact." *Harvey Barnett*, 338 F.3d at 1129.

The DTSA is similar. It allows "[a]n owner of a trade secret that is misappropriated" to file suit "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To pursue a claim under the DTSA, "the plaintiff must demonstrate '(1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce.'" *Double Eagle Alloys*, 134 F.4th at 1087 (citation omitted). The DTSA defines a "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" if "the information derives independent economic value" from being kept secret. 18 U.S.C. § 1839(3). And in line with the CUTSA, "the owner must have 'taken reasonable measures to keep such information

12

secret[.]'" *Double Eagle Alloys*, 134 F.4th at 1087 (quoting § 1839(3)); *see also James B. Oswald Co. v. Neate*, 98 F.4th 666, 675 (6th Cir. 2024) (same).

The district court granted summary judgment on both trade secret claims. It first determined that "ownership" is an element of both trade secret statutes at issue. The district court then found that Snyder offered insufficient evidence for a reasonable jury to conclude that Snyder "owned" the Guardian Broker List.

In this case, as in many trade secrets cases, the elements of the DTSA and CUTSA claims tend to merge. *See, e.g.*, *Double Eagle Alloys*, 134 F.4th at 1088 n.8 (analyzing a claim under the Oklahoma Uniform Trade Secrets Act and the DTSA "together, because the elements of both claims are substantially similar"). To this end, "[n]early all" 50 states have adopted the Uniform Trade Secrets Act (UTSA), and "courts routinely look to caselaw discussing other states' versions of the UTSA as persuasive authority." *Id.* at 1088 n.7.

There is at least one major distinction, however, between the two statutes. The DTSA expressly allows only an "owner" to pursue a claim for misappropriation. *See* 18 U.S.C. § 1836(b)(1) ("An *owner* of a trade secret that is misappropriated may bring a civil action under this subsection[.]" (emphasis added)). But the CUTSA uses different language to establish who can bring a lawsuit for misappropriation of a trade secret. Although it

13

defines a trade secret by reference to an "owner" of the secret, Colo. Rev. Stat. § 7-74-102(4), it states that a trade secret misappropriation claim may be filed by a "complainant," § 7-74-104(1). The terms "owner" and "complainant" are not defined in the statute.

As Snyder argues, the summary judgment order is internally inconsistent on the first element of a CUTSA claim. It lists the first element as possession, not ownership, of a trade secret. *See* Aplt. App. V at 194 (stating that "to succeed on a misappropriation claim arising under CUTSA, the plaintiff must demonstrate '[1] that he or she *possessed* a valid trade secret'" (emphasis added) (quoting *Gates Rubber Co.*, 9 F.3d at 847)); *accord DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1176 (D. Colo. 2019) (listing possession as the first element). But the district court entered summary judgment against Snyder because it found he provided insufficient evidence of his "ownership" of the Guardian Broker List. Aplt. App. V at 206. Thus, the summary judgment order appears to contradict the controlling Tenth Circuit authority it quotes. Although the order lists "possession" as the first element, it ultimately concludes that "ownership"

is the first element under the CUTSA and grants summary judgment on this basis.[3]

We decline to affirm summary judgment on the CUTSA claim based on Snyder's lack of "ownership" of the Guardian Broker List. The district court did not explain why it departed from the Tenth Circuit's holding in *Gates Rubber* on the first element, and we are "bound by the precedent of prior panels" set forth in a published opinion like *Gates Rubber* "absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *Green Sol. Retail, Inc. v. United States*, 855 F.3d 1111, 1115 (10th Cir. 2017) (citation omitted).

For all these reasons, we do not affirm summary judgment based on the "ownership" element of the CUTSA claim.

---

[3] At summary judgment, neither party argued that the Tenth Circuit's decision in *Gates Rubber* was controlling or that possession was sufficient under the CUTSA. Aplt. App. V at 196 (observing that "the [p]arties to this case agree that ownership is a required element of a CUTSA misappropriation claim"). In fact, Snyder represented the opposite in his summary judgment response. *Id.* at 101 ("The parties do not dispute that 'ownership' is an element of a misappropriation claim."). Snyder is permitted to challenge the district court's ruling on appeal, however, because the district court "passed upon" the disputed issue at length in its order. *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 991–92 (10th Cir. 2019). And because Beam does not argue that Snyder invited the district court's error based on its argument on the first element at summary judgment, we do not address the invited error doctrine and take no position on its possible application here. *See John Zink Co. v. Zink*, 241 F.3d 1256, 1259 (10th Cir. 2001) (describing the invited error doctrine).

Nevertheless, we do not need to reverse and remand for error regarding a misapplication of the law as to whether Snyder owned or possessed Guardian trade secrets. Rather, we can proceed to the two other trade secret challenges raised by Beam at summary judgment, which apply to both the federal and Colorado trade secret statutes: whether Snyder took reasonable measures or efforts to maintain secrecy and whether Beam misappropriated the Guardian Broker List.[4] The "threshold issue" in a misappropriation of trade secrets case, after all, is whether a cognizable trade secret even exists. *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 957 (Fed. Cir. 1984). A trade secret owner is bound to take ongoing "measures" that are "reasonable under the circumstances to maintain its secrecy," *Hertz*, 576 F.3d at 1112 (quoting *Colorado Supply*, 797 P.2d at 1306), or else a trade secret loses its status as a trade secret. In other words, "[t]he cornerstone of a trade secret . . . is secrecy." *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 850 (1st Cir. 1985).

Although the district court did not address Beam's two additional trade secret arguments, we may "affirm the judgment of the district court on any grounds for which there is a record sufficient to permit conclusions

---

[4] The dissent contends that a fact-issue exists on the lawfulness of Snyder's possession. Maybe so. But for purposes of our analysis as to maintaining secrecy and misappropriation, we can assume the lawfulness of his possession.

of law, even grounds not relied upon by the district court[,]" *U.S. ex rel.*
*Burlbaw v. Orenduff*, 548 F.3d 931, 940 (10th Cir. 2008) (quoting *V–1 Oil*
*Co. v. Means*, 94 F.3d 1420, 1423 (10th Cir. 1996)); *see also Double Eagle*
*Alloys*, 134 F.4th at 1100 n.19 (same), "so long as the appellant has 'had a
fair opportunity to address that ground,'" *Alpine Bank v. Hubbell*, 555 F.3d
1097, 1108 (10th Cir. 2009) (citation omitted).

At summary judgment, Snyder fully addressed both arguments. *See*
Aplt. App. V at 104–08 (responding to challenges on reasonable measures);
*id.* at 108–11 (responding to challenges on misappropriation). Thus, because
Snyder had a fair opportunity to responded to Beam's two other arguments,
we now consider them.

**1**

Both the CUTSA and the DTSA require reasonable measures or
efforts of secrecy for a trade secret to maintain its protected status. *See*
*Colorado Supply*, 797 P.2d at 1306 (discussing types of reasonable efforts
that suffice); *Hertz*, 576 F.3d at 1112–13 (same). What is "reasonable" is
fact-dependent, but in all cases it requires a higher level of diligence than
"normal business precautions[.]" *Colorado Supply*, 797 P.2d at 1306; *accord*
*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("[i]f an individual
discloses his trade secret to others who are under no obligation to protect

17

the confidentiality of the information, . . . his property right is extinguished.").

Snyder insists that he took reasonable measures and efforts to maintain secrecy by saving the Guardian Broker List on his personal computer, on a USB drive, and on his password-protected work laptop. But even taking the facts in the light most favorable to him, these relatively benign actions are not reasonable measures to maintain the secrecy of the Guardian Broker List. Standing on its own, saving the alleged trade secret on the employer's laptop – without protecting the document with a password or marking it as a trade secret or even confidential – is unreasonable.

Snyder's other actions can only be described as unreasonable, given the context and circumstances of the trade secret claim. In his summary judgment response, he admits that he did not label the state-specific lists as confidential, password protect the lists, require a confidentiality agreement to be signed by any Beam employees, or inform the Beam recipients that the broker names were confidential. *Id.* at 106. In turn, by openly sharing the Guardian Broker List with multiple Beam employees without any restrictions or notice that the information was a trade secret, Snyder failed to take reasonable measures or efforts of secrecy under federal or Colorado law. *See Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1190 (10th Cir. 2009) (reversing judgment on trade secret claim because the

information was freely shared without any limitations); *Double Eagle Alloys*, 134 F.4th at 1093 (affirming summary judgment where plaintiff failed to "prevent" the recipient "from sharing" the alleged trade secret).

Snyder argues that he "limited the disclosure" to the Texas, Utah, and Colorado broker lists via his three emails to a total of ten Beam employees. Aplt. App. V at 106. But even construing the facts in the light most favorable to Snyder, no reasonable jury could find that Snyder "limited" their access. In his cover email attaching these spreadsheets, he did not include any language stating that access was restricted or that these documents could not be shared – either internally within Beam or externally with the world. Nor did he mark any of the spreadsheets as confidential or a trade secret. And Snyder sent three separate emails with the full Guardian Broker List attached; in total, he sent the Guardian Broker List to ten Beam employees.

Snyder amplified his claimed accidental disclosure by failing to claw back the Guardian Broker List, failing to notify Beam's employees of his mistake, and failing to mark any of these spreadsheets as a trade secret (or even as confidential) before sharing them with Beam employees. We have recognized that disclosure of a trade secret does not automatically defeat trade secret protection, but once disclosed, a plaintiff must take affirmative steps to safeguard the information and mitigate the blast radius of the

19

accidental disclosure. *See Gates Rubber*, 9 F.3d at 848–49 (allowing trade secret protection only because the plaintiff took steps to seal a hearing transcript and avoid further disclosure of secret information).

On top of this, Snyder affirmatively ratified his disclosure by telling Beam's Chief Executive Officer that he had purposefully shared the Guardian Broker List (not just the state-specific lists) with Beam's employees. He admitted in his deposition that he told Beam's CEO that he shared the Guardian Broker List on purpose and never told Beam that his emails were sent by accident. *See* Aplt. App. V at 107–08.

Even though the issue of trade secrecy is an issue of fact, a point Snyder repeatedly emphasizes, summary judgment is nevertheless proper. This is because no reasonable jury could conclude that Snyder's actions meet the minimum definition of reasonable measures or efforts to maintain secrecy under the CUTSA or the DTSA. *See Double Eagle Alloys*, 134 F.4th at 1093. Our sister circuits have affirmed summary judgment against trade secret plaintiffs on this basis, too. *See, e.g.*, *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1300–01 (11th Cir. 2018) (affirming summary judgment in favor of former employee because employer failed to take reasonable measures to keep information secret under the Florida Uniform Trade Secrets Act); *Strategic Directions Grp., Inc. v. Bristol-Myers*

*Squibb Co.*, 293 F.3d 1062, 1064–65 (8th Cir. 2002) (affirming summary judgment); *Buffets, Inc. v. Klinke*, 73 F.3d 965, 969 (9th Cir. 1996) (same).

In the end, at summary judgment, a trade secret plaintiff must produce "sufficient evidence that could meet the definition of a trade secret under the DTSA and [C]UTSA." *Double Eagle Alloys*, 134 F. 4th at 1097 n.19. Snyder failed to offer sufficient evidence showing that he took reasonable measures or efforts of secrecy toward the Guardian Broker List, so we affirm summary judgment on Claims One and Two.

**2**

We also briefly acknowledge Beam's final argument for summary judgment, that it did not misappropriate the Guardian Broker List from Snyder. Misappropriation "requires proof of a breach of trust or confidence." *Gates Rubber*, 9 F.3d at 848 (interpreting the CUTSA); *see also Colorado Supply*, 797 P.2d at 1306 (agreeing "there was no misappropriation because there was no improper acquisition of the information and because the . . . agreements imposed no duty on [the defendant]" regarding the alleged trade secret). And "[t]he DTSA defines 'misappropriation' as 'acquisition of a trade secret' by 'improper means,' or 'disclosure or use of a trade secret' by an unauthorized person meeting certain other conditions." *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 484 (7th Cir. 2024); *accord Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 657

21

(7th Cir. 1998) (same); *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1238 (8th Cir. 1994) (advising that "the critical inquiry is whether the defendant obtained the secret by 'improper means'" (quoting Restatement (First) of Torts § 757(a) (1939))).

In this case, as we have explained, Beam received the Guardian Broker List directly from Snyder via three emails to ten employees sent without any restrictions. Snyder admits that he emailed the Guardian Broker List directly to several Beam employees with no strings attached and then ratified his accidental disclosure by telling Beam's CEO that he shared the full Guardian Broker List on purpose. But he also claims that Beam had promised to pay him "for the spreadsheets 'off the books.'" Op. Br. at 8; R. V at 108-09.

Again, the district court did not make a finding regarding misappropriation. It is arguable whether Snyder's assertion about a side deal promise creates a *genuine* issue of material fact. No matter, though, as we are not required or inclined to resolve this argument because we affirmed summary judgment on another ground.

In sum, we affirm summary judgment on Claims One and Two.

**B**

We next evaluate Snyder's challenge to the district court's order striking Snyder's damages expert, Adamy, under Rule 702. The Rule 702

22

Order not only excluded Adamy as an expert witness, but it also excluded Snyder from offering any evidence or witness from testifying at trial about Snyder's alleged damages for lost earnings and wages. Which is to say, the district court determined that Snyder "cannot recover future lost wages on any of his remaining claims," so Adamy's (or any expert) testimony "would not assist the jury in its fact-finding functions." R. V at 233.

The parties dispute our standard of review for this issue. Beam says that we are to review the district court's exclusion of an expert witness under the more deferential abuse of discretion standard. That is generally true for our review of a district court's decision to exclude an expert witness from testifying at trial, "[b]ut a district court always abuses its discretion when it errs on a legal question, and we decide the presence or absence of legal error de novo." *El Encanto, Inc. v. Hatch Chile Co., Inc.*, 825 F.3d 1161, 1162 (10th Cir. 2016). Applying the "wrong test" to decide an issue is "legal error[.]" *United States v. Nkome*, 987 F.3d 1262, 1269 (10th Cir. 2021) (internal quotation marks and citations omitted).

In this case, the district court's Rule 702 Order spotted the concern that it was entering summary judgment without formally complying with Federal Rule of Civil Procedure 56. *See* Aplt. App. V at 225 ("The [c]ourt notes that while this argument is framed as an argument challenging Mr. Adamy's opinions under Rule 702, the argument goes to the substantive

23

merits of Mr. Snyder's requested relief and would have been more appropriately raised at the summary-judgment stage."). The Rule 702 Order then stated that "neither party suggests that the [c]ourt cannot resolve this issue on the papers here." *Id.* But it included no citation to support this statement, and it does not explain why Snyder was required to predict that the district court would exclude all evidence and block all witnesses from testifying at trial on lost wages. A motion filed under Rule 702, by definition, only relates to expert witnesses. Thus, we do not agree that Snyder was provided fair notice that he was required to marshal all his fact evidence and legal arguments in response to a motion to exclude expert witnesses.

In challenging the Rule 702 Order, Snyder's argument on appeal is narrow. He does not question the district court's decision to exclude Adamy from testifying at trial under Rule 702. Rather, he challenges using the Rule 702 Order to exclude all evidence and block all witnesses from testifying on lost wages damages at trial. The district court expanded the Rule 702 Order's scope when it stated: "[t]o be clear, this [c]ourt will not permit any evidence or argument as to lost wages, regardless of the witness." *Id.* at 234 n.6.

We reverse the Rule 702 Order. It makes dispositive rulings on damages and the lack of evidence proffered by Snyder that are effectively

summary judgment rulings. As we have held, a district court "may grant summary judgment sua sponte so long as the losing party was on notice that [it] had to come forward with all of [its] evidence." *Sports Racing Servs., Inc. v. Sports Car Club of America, Inc.*, 131 F.3d 874, 892 (10th Cir. 1997) (citation and internal quotation marks omitted). When a district court enters summary judgment without providing notice to the nonmovant, however, we usually reverse and remand. *See id.*

The filing of a summary judgment motion brings with it the protections and briefing schedule set forth in Federal Rule of Civil Procedure 56 and the local rules of the district court. *See Shepherd v. Liberty Acquisitions, LLC*, No. 11-CV-00718-CMA-MEH, 2013 WL 1117046, at *1–2 (D. Colo. Mar. 15, 2013) (recognizing that the plaintiff lacked notice and suffered actual prejudice from the premature entry of summary judgment without proper notice). A motion for summary judgment is decided under the Rule 56 framework, and it provides procedural

protections to the nonmovant,[5] along with a de novo standard of review on appeal. In contrast, a motion to exclude an expert witness is decided under the more deferential standard set forth in Rule 702, and it does not follow the Rule 56 framework or provide any of Rule 56's protections to the nonmovant.

On the substance of the Rule 702 Order, the district court held that Snyder failed to offer evidence in support of Claims Three, Four, and Five, so he was not entitled to any damages for lost earnings or wages. But the district court reached this conclusion only by reviewing the factual record and pointing out gaps in what Snyder provided or argued in support of his claims for relief – not simply what he designated Adamy to cover at trial. This form of analysis should have been performed under the summary judgment framework, not the legal standard for expert witnesses. *See*

---

[5] "[B]efore a district court may properly grant a motion for summary judgment, certain procedural protections must first be afforded to the non-moving party." *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011). These procedural protections include the opportunity to respond and present evidence, the ability to obtain additional discovery and delay a ruling on summary judgment upon a proper showing, a legal standard that favors the nonmovant (all evidence is viewed in the light most favorable to the nonmovant and all reasonable inferences are taken in favor of the nonmovant), and the initial burden is placed on the nonmovant to show that there is no genuine issue of material fact. *See generally* Fed. R. Civ. P. 56; *Interstate Med. Licensure Compact Comm'n v. Bowling*, 113 F.4th 1266, 1284 (10th Cir. 2024) (discussing our circuit's general rule against a district court sua sponte entering summary judgment without providing proper notice and an opportunity for the nonmovant to respond).

*Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1151 (10th Cir. 2017) (explaining that "a party who was prejudiced by the lack of advance notice of a sua sponte summary judgment decision generally will not have come forward with all of his evidence or arguments in the district court proceedings; indeed, it is the very fact that the losing party did not develop and present his evidence and/or arguments below that will help to establish prejudice from the lack of notice").

We express no view as to whether Snyder can point to sufficient evidence supporting his alleged damages for lost earnings and wages, but he at least points to some evidence that he could have offered if he had been told that the district court was going to enter summary judgment on damages. *See* Reply Br. at 23 n.15. This evidence might be thin and undeveloped, but he has shown prejudice such that on remand he might be able to offer sufficient evidence to create a genuine issue of material fact for trial. *See Oldham*, 871 F.3d at 1151 (explaining that prejudice is required for us to reverse and remand in this context).

In sum, we reverse the Rule 702 Order, which should be limited to exclude only expert witnesses, like Adamy, who are subject to Rule 702.

27

## IV

We **AFFIRM** the entry of summary judgment on Claims One and Two for misappropriation of a trade secret. We **REVERSE** the Rule 702 Order and **REMAND** for further proceedings consistent with this opinion. The motion to seal a portion of the record is **GRANTED**.

*John Snyder v. Beam Technologies, Inc.*, No. 24-1136
**BACHARACH**, J., dissenting in part.[1]

In this appeal, we address who can sue for misappropriation of a trade secret. Can a lawful possessor of a trade secret sue for its misappropriation? I would answer *yes*.

The majority agrees, but bases its disposition on an argument that the defendant hasn't made on appeal. I would instead remand for the district court to address this argument in the first instance.

**1.     This case stems from the alleged misappropriation of a broker list.**

The alleged trade secret is a broker list possessed by the plaintiff, Mr. John Snyder. Mr. Snyder obtained the list when he sold life insurance for Guardian Life Insurance Company. Guardian fired him for unrelated reasons, and he then obtained a new job at Beam Technologies, Inc. When Mr. Snyder started the new job, he accidentally sent the broker list to Beam.

Mr. Snyder alleges that Beam misappropriated the broker list and claims violation of federal law (the Defend Trade Secrets Act) and state law (the Colorado Uniform Trade Secrets Act). On these claims, Beam

---

[1]     I join Part III(B) of the majority opinion, which addresses exclusion of evidence involving lost earnings and wages. The availability of lost earnings and wages could affect Mr. Snyder's claims of (1) obtaining workers through misrepresentation, (2) fraudulent misrepresentation, and (3) promissory estoppel.

obtained summary judgment on the ground that the list had been owned by Guardian rather than Mr. Snyder.

### 2. We conduct de novo review based on the summary-judgment standard.

We engage in de novo review of the grant of summary judgment, viewing the evidence in the light most favorable to Mr. Snyder. *Zahourek Sys., Inc. v. Balanced Body Univ., LLC*, 965 F.3d 1141, 1143 (10th Cir. 2020). With this view of the evidence, we consider whether Beam has shown the lack of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.*

### 3. We can consider the right to sue because the district court explicitly decided the issue.

On appeal, Mr. Snyder argues that he had a right to sue for misappropriation because he lawfully possessed the broker list. Responding at oral argument, Beam contends that Mr. Snyder forfeited the argument by failing to present it in district court. But the district court explicitly decided the issue by concluding that Mr. Snyder's lawful possession of the list would be insufficient for a jury to infer his ownership of the list.

Ordinarily an appellant forfeits an issue by failing to present it in district court. *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1259 (10th Cir. 2018). An exception exists when the district court explicitly decides the issue sua sponte. *See Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 991–92 (10th Cir. 2019). In this situation, we treat the issue as preserved.

2

*See id.* And, as noted, the district court explicitly decided the issue by concluding that Mr. Snyder hadn't owned the broker list, reasoning that no reasonable jury could find that he had owned the broker list based on his alleged right to possess it. Appellant's App'x, vol. 5, at 1328–29. So the majority correctly considers the issue preserved. Maj. Op. at 15 n.3.

**4.      Lawful possessors can sue for misappropriation of trade secrets.**

The district court concluded that Mr. Snyder couldn't sue for misappropriation because he didn't own the broker list. I disagree because

- a factfinder could reasonably determine that Mr. Snyder had lawfully possessed the broker list and

- lawful possessors can sue for misappropriation.

Like the majority, I believe that Colorado law allows suit by lawful possessors of the information even if they aren't considered *owners* in a conventional sense. *Id.* at 14–15. For this conclusion, the majority points to *Gates Rubber Co. v. Bando Chemical Industries*, where we said that the Colorado statute requires only *possession*. 9 F.3d 823, 847 (10th Cir. 1993); *Id.* We didn't explain that interpretation in *Gates Rubber*. But in my view, that interpretation is correct given the statutory subject and purpose.

If the information remains generally secret, each possessor derives its own value from the secret. *See Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 177–78 (3d Cir. 2020). So multiple possessors of a trade secret can simultaneously suffer loss from a single act of misappropriation.

3

Because of this potential loss, scholars have recognized that multiple possessors of trade secrets can sue for misappropriation. *See* Rudolf Callmann, *Required relationship to plaintiff*, *Callmann on Unfair Competition, Trademarks and Monopolies* § 14:26 (4th ed. 2025) (stating that "multiple entities can possess the same trade secret, and have standing to sue for misappropriation, so long as the knowledge is not *generally* known"); Roger M. Milgrim & Eric E. Bensen, *Burden of Proof and Defenses*, 4 *Milgrim on Trade Secrets* § 15:01 (2020) ("[B]ecause the gravamen of a [Uniform Trade Secrets Act] misappropriation action is wrongful acquisition or improper use of information gained from a plaintiff, lawful *possession*, as opposed to *ownership*, suffices.").

Sometimes trade-secret laws allow lawful possessors to sue by broadly defining *ownership*. An example lies in the federal trade-secret law, which defines *ownership* based on the existence of a legal title, an equitable title, or a license. 18 U.S.C. § 1839(4). For purposes of this law, legal title to a trade secret extends to individuals in lawful possession. *See* William C. Holmes, *Overview*, 1 *Holmes, Intellectual Property and Antitrust Law* § 2.1 (2025) ("Under the [Defend Trade Secrets Act], an owner or other lawful possessor of a trade secret that is 'misappropriated' may bring a civil action in federal district court . . . .").

The state statute doesn't restrict suits to an owner; the statute requires only that the owner take reasonable measures to keep the

4

information secret. Colo. Rev. Stat. § 7-74-102(4). Despite the wording of the state statute, Beam argues that the reference to an *owner* must implicitly restrict the right to sue to the owner of the trade secret.

For this argument, Beam cites only one opinion from a Colorado court: *Mineral Deposits v. Zigan*, 773 P.2d 606, 608 (Colo. Ct. App. 1988). There the court explained that a party who misappropriates a trade secret "will be liable in damages to the owner of the trade secret." *Id.* But the court didn't suggest that owners were the only parties who could prevail.[2]

---

[2]    Beam cites three unpublished opinions.

For example, Beam cites *Gaedeke Holdings VII LTD v. Baker*, 683 F. App'x 677 (2017) (unpublished). There we held that the Oklahoma trade-secrets law doesn't require *ownership*. *Id.* at 684. We noted that Oklahoma law's definition of a *trade secret* didn't refer to the *owner*'s responsibility to keep the information secret. *Id.* But we didn't suggest that such a reference would limit misappropriation claims to owners. To do so would have conflicted with our published opinion in *Gates Rubber*. Maj. Op. at 15; *see* p. 3, above.

Beam also cites *RV Horizons, Inc. v. Smith*, No. 18-cv-02780-NYW, 2020 WL 6701119 (D. Colo. Nov. 13, 2020), and *RMS Software Development, Inc. v. LCS, Inc.*, No. 01-96-00824-CV, 1998 WL 74245 (Tex. Ct. App. Feb. 19, 1998) (unpublished). But we must predict how the Colorado Supreme Court would interpret the statute. *Johnson v. Riddle*, 305 F.3d 1107, 1118–19 (10th Cir. 2002). For this inquiry, the unpublished opinions of a federal district court and a Texas court provide little guidance.

Granted, we can consider the "general weight and trend of authority" in caselaw from other jurisdictions. *Safeway Stores 46 Inc. v. WY Plaza LC*, 65 F.4th 474, 483 (10th Cir. 2023). But *RV Horizons* and *RMS Software* provide little reason to question the sufficiency of lawful possession as the governing standard in Colorado.

5

Such a narrow interpretation would be inconsistent with the statute's express purpose of ensuring uniformity with the trade-secrets laws in other states. *See* Colo. Rev. Stat. § 7-74-109 ("This article shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this article among states enacting it."); *see also* William C. Holmes, *Overview*, 1 *Holmes, Intellectual Property and Antitrust Law* § 2:1 (2025) (noting that all states, except New York, have adopted the Uniform Act). When interpreting similar versions of the uniform trade-secrets statute, courts generally have declined to require ownership before a party can sue for misappropriation. *See, e.g.*, *Gaedeke Holdings VII Ltd. v. Baker*, 683 F. App'x 677, 683–84 (10th Cir. 2017) (unpublished) (concluding that Oklahoma's version of the Uniform Trade Secrets Act didn't require ownership in order to sue for misappropriation of trade secrets); *Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 177–78 (3d Cir. 2020) (concluding that lawful possessors can sue for misappropriation under Pennsylvania's version of the Uniform Trade Secrets Act); *DTM Rsch. LLC v. AT&T Corp.*, 245 F.3d 327, 331–32 (4th Cir. 2001) (concluding that a possessor of a trade secret can sue for misappropriation under Maryland's version of the Uniform Trade Secrets Act). Given the interpretation of other state statutes, I wouldn't assume that Colorado's statute silently restricts suit to owners of the trade secret. *See* Sarah Gettings, *Burbank Grease Services, LLC v. Sokolowski:*

6

*Frustrating Uniformity in Trade Secret Law*, 22 Berkeley Tech. L.J. 423, 438 (2007) ("The objective of the [Uniform Act], as embodied in the uniformity clause, which guarantees '[u]niformity of application and construction,' is uniform application of the Act as a whole."). So I would conclude that Colorado law does not restrict suit to owners.

\* \* \*

This conclusion would entitle a lawful possessor to sue for misappropriation under both federal law and state law.

5.    **A fact-issue exists on the lawfulness of Mr. Snyder's possession.**

Beam argued in its summary-judgment motion that Mr. Snyder didn't lawfully possess the broker list. But he testified that Guardian had given him the right to possess the list. Appellant's App'x, vol. 5, at 1228. This testimony creates a genuine fact-question at the summary-judgment stage.

Beam could have contended that Guardian had intended for this permission to end when he left the job. But Beam didn't make this contention in the summary-judgment motion or even in the reply brief. Granted, Beam made this contention at oral argument in the appeal. But oral argument was too late: Beam didn't make this contention either in the summary-judgment motion or in the appeal briefs.[3] *See United States v.*

_____

[3]    In its summary-judgment brief, Beam said: "[Mr. Snyder] did not have permission tho [sic] use or possess the Guardian Broker List after his employment with Guardian ended." Appellant's App'x, vol. 4, at 851. But this sentence, lacking any explanation or support, didn't develop a distinct

7

*Gaines*, 918 F.3d 793, 800–01 (10th Cir. 2019) ("We typically decline to consider an appellee's contentions raised for the first time in oral argument.").

Mr. Snyder thus raised a genuine fact-question on whether he lawfully possessed the broker list.

**6.     We should let the district court resolve the arguments raised there rather than decide them without any appellate briefing.**

The majority also rejects the district court's reasoning, but affirms by concluding that the information didn't constitute a trade secret. Maj. Op. at 16–21. Beam raised this issue in district court, but the court decided the matter on another ground and Beam doesn't raise the issue here. In this circumstance, we ordinarily remand the issue for the district court to resolve in the first instance. *See Evers v. Regents of Univ. of Colo.*, 509 F.3d 1304, 1310 (10th Cir. 2007) (holding that the better practice on issues raised in district court, but not decided there, is to "leav[e] the matter to the district court in the first instance"); *Rife v. Okla. Dep't of Pub. Safety*, 854 F.3d 637, 649 (10th Cir. 2017) (stating that the better practice is to leave the matter to the district court when it declined to decide an issue).

---

argument that Guardian had terminated Mr. Snyder's right to possess the broker list. *See Kellogg v. Watts Guerra LLP,* 41 F.4th 1246, 1262 (10th Cir. 2022) (holding that a single sentence in an appellate brief is insufficient to raise an argument); *Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1148 n. 3 (10th Cir. 2008) (holding that an argument raised in a single sentence is inadequately developed).

8

Applying our ordinary practice is sensible here because we have no appellate briefing on the adequacy of Mr. Snyder's safeguards. *See Safeway Stores 46 Inc. v. WY Plaza LC*, 65 F.4th 474, 496 (10th Cir. 2023) (stating that we would not ordinarily consider affirming a summary-judgment ruling based on arguments made in the district court but not in the appeal). So I would remand to the district court to consider Beam's argument denying the existence of a trade secret.

* * *

A lawful possessor can sue for misappropriation of a trade secret, and a factfinder could reasonably determine that Mr. Snyder had lawfully possessed the broker list. Given the reasonableness of that factual determination, the district court erred in granting summary judgment to Beam on the misappropriation claims.

Because of that error, I would remand to the district court to further consider the existence of a trade secret. The district court is ideally suited to decide this issue in the first instance. So I would reverse the grant of summary judgment on the misappropriation claims and remand to the district court for further consideration of Beam's alternative arguments for summary judgment.